## CONFEDERATED BANDS OF UTE INDIANS v. UNITED STATES.

### No. 45783.

Court of Claims.

March 4, 1946.

Ernest L. Wilkinson, of Washington, D. C. (John W. Cragun and Francis M. Goodwin, both of Washington, D. C., on the brief), for plaintiff.

Wilfred Hearn, of Washington, D. C., and J. Edward Williams, Acting Asst. Atty. Gen. (George T. Stormont and Marvin J. Sonosky, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

The issue in this case is over the defendant's liability to account for the sale of certain lands added to plaintiffs' reservation by Executive Order.

On March 2, 1868, 15 Stat. 619, the parties entered into a treaty under the terms of which the plaintiffs ceded to the defendant all the lands to which they laid claim, except those in the southwest section of the present State of Colorado. The lands reserved were bounded on the east by the 107th parallel of west longitude, on the south by the southern boundary of the State of Colorado, on the west by the western boundary of that State, and on the north by a line drawn due east from the western boundary beginning at a point 15 miles north of the 45th parallel of north latitude.

Not until more than seven years later was any attempt made to designate on the ground the northern boundary; but in the meantime the defendant, pursuant to the treaty, established an agency on the White River at a place it thought was south of the northern boundary line of the reservation. The Indians believed that the northern boundary was far to the north

of the location of this agency; and so, when some miners began working on Douglass Creek in Wyoming, they protested, because they said this was within the limits of their reservation. Later, they protested the location of a wagon road north of the White River agency, because they said this was within the limits of their reservation.

When in 1875 a survey showed that the northern boundary was south of this agency the Indians manifested considerable dissatisfaction. In order to pacify them, the President, on the recommendation of the Commissioner of Indian Affairs and the Secretary of the Interior, by Executive Order in 1875, withdrew from sale and set apart for the use of the plaintiff tribe certain lands north of the northern boundary "as an addition to the present reservation in said territory." "This action," the Commissioner of Indian Affairs wrote to the Indian Agent, "fully protects your Indians in the peaceable possession of their improvements in the White River valley and the Agency buildings, and will enable you to assure the Indians of the exact location of the limits of their reservation as enlarged."

In September 1879 some of the White River Utes massacred the Indian Agent and all the agency's male employees and others, and ambushed and killed a small detachment of soldiers. The chiefs and headmen of the tribe were summoned to Washington for the purpose of bringing about the apprehension of the guilty parties and of securing an agreement from them for the cession of their reservation. An agreement was secured to cede to the United States all of their reservation, except certain lands that were to be alloted to them in severalty. All the lands not allotted in severalty the defendant agreed to sell for the account of the Indians. This agreement was ratified by Congress on June 15, 1880, 21 Stat. 199.

The question presented is whether or not there was included in the lands to be sold for the account of the Indians those lands which were added to the reservation by Executive Order in 1875.

· The parties agree that the Indians secured no title to these lands by virtue of the Executive Order alone,[1] but plaintiffs say that the President's action in adding them to the reservation was ratified by Congress by the Act of June 15, 1880. Plaintiffs say that in the preamble to this Act it is recited that the chiefs and headmen of the confederated bands of the Ute Tribe of Indians had · agreed upon a sale to the United States "of their *present* reservation in the State of Colorado," (italics ours), and that the agreement itself recites that the chiefs and headmen agreed to use their best efforts to get their people to consent to the cession to the United States of "all the territory of the *present* Ute Reservation in Colorado." They say that at the time the chiefs and headmen entered into this agreement they believed that the lands added to ´ their reservation by Executive Order were legally a part of their reservation and that, therefore, it is evident that it was their intention to convey these lands to the United States, as well as their other lands, and, therefore, it follows that they understood that the United States was agreeing to sell for their account these lands along with their other lands.

In all probability this is true. The Indians were no doubt ignorant of the legal requirements for vesting title in them to a part of the public lands, and so, when they were informed by the Indian Agent that these lands had been added to their reservation, they in all probability believed that they were as much a part of their reservation as were the lands set aside by the treaty of March 2, 1868. So, when these chiefs and headmen entered into the agreement ratified by the Act of June 15, 1880, they no doubt believed that they were ceding to the United States these lands as well as others.

However, the essential thing in order to charge the United States is that it should have agreed to sell these lands for the account of the Indians. If it did not, it is not liable for not having done so, whatever the Indians may have thought it had agreed to do.

The agreement of the United States is set forth in the Act of June 15, 1880. That Act in its preamble says that the chiefs and headmen of the Ute Tribe had presented an agreement to the Secretary of the Interior, and that the President had submitted the agreement to Congress "for acceptance and ratification." Congress ratified it with certain provisos not material here. The agreement, which is set out in full in the Act, provided for a cession of the

---

[1] Sioux Tribe of Indians v. United States, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501.

Ute reservation to the United States in consideration of which the United States agreed to do certain things which were enumerated. These were to make certain allotments, to pay a certain amount of annuities, to provide agricultural lands and farming equipment, to educate their children, and to continue in force the treaty of 1868 and the agreement which was ratified by the Act of April 29, 1874, 18 Stat. 36. Nothing was said in the agreement about a sale of the ceded lands for the Indians' benefit, but Congress added an agreement to that effect in section 3 of the Act of June 15, 1880. This reads in part:

" * * * and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands, at the same price and on the same terms as other lands of like character, except as provided in this act: * * *."

The Act then proceeds to set forth what shall be done with the money derived from the sale of the lands.

It will thus be seen that the United States agreed to sell for the account of the Indians only those unallotted lands "the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States." This did not include the lands added to the reservation by Executive Order because the Indians did not have title to these lands and, hence, title to them was not conveyed by the agreement referred to. The United States agreed to sell for the account of the Indians only those lands the title to which was conveyed to them by this agreement.

At the time Congress ratified this agreement, it must have known of the addition to the reservation by Executive Order and, hence, purposely, it limited its agreement to sell the Indians' lands for their account to those lands the title to which was conveyed by the agreement. It evidently meant to exclude the lands the Indians had been occupying under the Executive Order, but to which they had no title.

The Indians proposed to cede their "present reservation"; Congress knew they probably considered these Executive Order lands a part of their "present reservation," and so it was careful to limit its agreement to sell for the Indians' account those lands to which the Indians had title. It did not mean to ratify and confirm the President's action in setting apart these lands "as an addition to their present reservation in said Territory," and it plainly said so.

Whether this was explained to the Indians we do not know, but it is plain that Congress did not intend to agree that these Executive Order lands should be sold for the Indians' account, and, in the absence of such an agreement, the defendant is not liable for not having done so.

The parties charged with carrying out the Act so construed it. On August 2, 1882, the Commissioner of Indian Affairs recommended to the Secretary of the Interior, "that the lands set aside by Executive Order of November 22, 1875, for the use of the several tribes of Ute Indians, be restored to the public domain." This was done by Executive Order on August 4, 1882. Had the Commissioner and the Secretary of the Interior and the President believed that Congress had intended by the Act of June 15, 1880 to vest title in the Indians to these Executive Order lands and had agreed that these lands should be sold for the account of the Indians, they would not have withdrawn them from the reservation and restored them to the public domain.

We are clearly of the opinion that the Indians never did acquire title to these Executive Order lands and that the Congress never did agree to sell them for the account of the Indians.

The view we take on the merits makes it unnecessary for us to consider the other defenses raised by the defendant.

Plaintiffs' petition will be dismissed. It is so ordered.

WHALEY, Chief Justice, and JONES, Judge, concur.

LITTLETON, Judge (concurring).

I concur in the decision that plaintiff bands (hereinafter sometimes referred to as plaintiff) are not legally entitled to recover compensation as for a taking of the rectangular strip of land in controversy.

This land is situated between the first standard parallel north and a line running due west from a point on the 107th meridian fifteen miles due north of where said meridian crosses the fortieth parallel of north latitude. Plaintiff insists that when the treaty of March 2, 1868, was made and ratified it was believed and intended by the parties that this disputed area of land was included within the reservation as defined by the treaty of March 2, 1868, 15 Stat. 619. The strip of land in question is approximately three miles wide and about one hundred and eight miles long.

I do not understand from plaintiff's brief and oral argument that it is agreed that the Ute Indians did not acquire Indian title to this land by virtue of the treaty and the Executive Order of November 22, 1875, quoted in finding 10.

What plaintiff concedes is that where a treaty did not intend to give possessory Indian title and where the President by Executive Order simply withdraws public land belonging to the United States from entry or sale under the land laws of the United States and reserves it for Indian purposes as a part of a reservation, such as was done in the case of the Sioux Tribe of Indians v. United States, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501, the Indians do not acquire thereby an exclusive use and occupancy Indian title as against the United States. However, plaintiff's claim of exclusive use and occupancy title against the United States to the strip of land here in controversy is grounded upon the claim by the Ute Indians that the parties to the treaty of 1868 intended by art. 2 thereof that an east and west line from "a point fifteen miles due north of where said meridian [107° of longitude west from Greenwich] intersects the fortieth parallel of the north latitude" should include this controverted strip of land in the reservation because it was, for the most part, in the White River Valley, which valley the Indians desired to retain and which the Government intended they should have. In other words, plaintiff bands contend that they understood and intended that the point fifteen miles due north of where the 107th meridian intersects the fortieth parallel was farther north than where that point was finally, many years later, found to be. The true north boundary line of the reservation was not surveyed and established prior to the cession agreement of March 6, 1880. Plaintiff insist that by reason of this situation and the controversy which had existed up to the date of the Executive Order as to the intended location of the true north boundary line under the 1868 treaty, the protests of the White River Ute Indians prior to and in October 1875, when J. W. Miller made a survey in October 1875 of an east-west line from a point on the 107th meridian near the fortieth parallel of north latitude to the western boundary line of the Ute Reservation, and the letters written by the Indian Agent at the White River Agency, the President by said Executive Order of November 22, 1875, settled the dispute as to the correct north boundary line of the reservation and included the strip of land in controversy as a part of the reservation, as intended by the treaty.

Plaintiff contends that from and after the date of the Executive Order in 1875 the tribe understood and claimed, as it had theretofore understood and claimed, that the true north line of the reservation as intended in art. 2 of the treaty of 1868 included the land in question in the reservation as stated in the Executive Order and that after the issuance of the Executive Order no controversy as to the north boundary line of the reservation existed between the parties.

Plaintiff further insists that since the land in controversy was thus regarded and intended by both parties to be a part of the treaty reservation belonging to plaintiff tribe they understood and intended that such land was to be included in the territory to be released and ceded by the cession agreement of March 6, 1880, in which the Indians agreed to release and cede "to the United States all the territory of the present Ute Reservation in Colorado."

Plaintiff therefore claims that when Congress by the act of June 15, 1880, 21 Stat. 199–205, accepted and ratified this agreement without material change, describing it in said act as "an agreement for the sale to the United States of their present reservation in the State of Colorado," and in enacting certain provisions in said act for carrying out said agreement, which act was submitted to, accepted, and ratified by the Ute Tribe, as required by sec. 10 of said act, the Congress accepted and ratified the intention and understanding of plaintiff

and the United States as to the true north boundary line of the reservation under the treaty of 1868 as expressed and established in said Executive Order of November 22, 1875.

For the reasons stated plaintiff bands take the position that they acquired and had under the treaty and the Executive Order, and when the agreement of 1880 was made and ratified, exclusive use and occupancy, title to the land in controversy and became entitled under sec. 3 of said ratification act of June 15, 1880, which they accepted, to the proceeds from the sale of this strip of land, as from the sale of other land of the reservation after the reimbursements to the United States, as mentioned therein.

In addition to the official correspondence quoted in the findings, the following letters taken from Senate Executive Document No. 29, January 7, 1880, 46th Congress, 2d Session, pp. 41–45, are pertinent:

"White River Indian Agency,
"White River, Colo., May 7, 1877.

"Sir. I have to advise you that the matter of the coming in upon the Ute Reservation by white persons to settle and to prospect for gold is being agitated by some parties in the country about.

"The very unfortunate mistakes made by Mr. Miller in his *intended* survey of the northern boundary of the Ute Reserve has led to much talk and discussion as to the rights of the Ute Indians to the White River Valley. It is due to the Indians of this reserve, and to the quiet and well being of the white settlements near, that this agitation should cease; that the mistake made by Mr. Miller should be officially rectified by authorities in the Land Office; that correct maps indicating the true position of the northern boundary of the Ute Reserve in Colorado should be circulated, sent for distribution to Denver, Middle Park, and to other places.

"The treaty plainly states that the northern boundary shall be a line fifteen miles north of the fortieth parallel of latitude. All the authorities of the 'Hayden Survey,' and of all maps which I have seen, place the fortieth parallel about two miles north of the location of this agency. Mr. Miller ran his line for the northern boundary one-half a mile south of this agency, making a mistake of about seventeen and a half miles.

"I ask whether I will be supported if I endeavor to remove persons coming upon the reserve to settle or to 'prospect'; and where I am to look for assistance to do so.
"Very respectfully, your obedient servant,
"E. H. Danforth,
"United States Indian Agent.
"Hon. J. Q. Smith,
"Commissioner of Indian Affairs,
"Washington, D. C."

"Department of the Interior,
"Office of Indian Affairs,
"Washington, May 23, 1877.
"Sir: Respecting the question of the occupancy of the White River Valley, in the northern portion of the Ute Reservation in Colorado, referred to in your letter of the 7th instant, you are advised that any person settling upon lands in Colorado south of the first standard parallel between the 107th degree of west longitude and the west boundary of Colorado since the 22d of November 1875, is there in violation of law, and subject to removal under sections 2147 to 2151, both inclusive, of the Revised Statutes [25 U.S.C.A. §§ 220–224]. If a removal is deemed necessary, you will report the facts to this office that proper action may be taken in the premises.

"The question of the right of occupancy is not affected by the accuracy of Mr. James W. Miller's survey. That question is settled by an executive order, dated November 22, 1875, whereby all the land between the 107th degree of west longitude and the western boundary of the State, as far north as the first standard parallel, was withdrawn from settlement and set apart as an addition to the Ute Reserve.

"The first standard parallel has been surveyed and its location properly marked by regulation mounds or monuments, and is at least 25 miles north of the agency buildings.

"I send you, for the files of your office, another copy of said executive order with copy of office letter of November 24, 1875, transmitting a copy thereof.
"Very respectfully,
"S. A. Galpin,
"Acting Commissioner.
"E. H. Danforth, Esq.,
"United States Indian Agent,
"White River Agency, Colorado."

In replying to the letter of the Commissioner of May 23, Agent Danforth on June

11, 1877, wrote the Commissioner, in part, as follows:

"White River Indian Agency,
"White River, Colo., June 11, 1877.

"Sir: I am in receipt of your letter of the 23d of May, in reply to my letter of May 7, asking for instructions as to the course I should pursue in case parties make an effort to settle in the northern portion of the Ute Reserve near my agency.

\*    \*    \*    \*    \*    \*

"The Utes fully believe that they have been deprived, unjustly, of part of their lands in the southern portion of their reserve, and from what I have been able to learn on the subject, I think the facts in the case justify their belief and the correctness of their statement that white settlers are at present occupying and farming their land. From what I see of the disposition and wishes of the white people in the neighborhood of the northern portion of the reservation, they would gladly deprive the Utes of this country, and that they are preparing to take the first steps to accomplish it I am satisfied. Efforts are being made to raise colonies to settle in the White River Valley; one party of about sixty families is reported en route. I have a letter from the leader of another party, asking me for information and directions.

"There is already one party upon the reserve, hunting and prospecting for gold. The settlers of the neighboring valleys are loud in their talk that they have a perfect right to come and settle here, and are proposing to do so. Much of this discussion has arisen, as I said before, no doubt, from the mistakes of the Miller survey. It continually comes to me that members of this party were very free in declaring in their progress through the country that this agency was off the reservation, and the entire White River Valley was not Indian country. I repeat here, most decidedly, that it is the duty of the Indian Office, through the Land Office, or in some other way to publish *very widely* throughout Colorado, and very soon, too, the true boundaries of this reservation, and to circulate correct maps indicating the same to the eye. A little care taken *now* in this direction will save a great deal of trouble to Indians and whites, and to the authorities of the country in future.

\*    \*    \*    \*    \*    \*

"Very respectfully, your obedient servant.
"E. H. Danforth,
"United States Indian Agent.

"Hon. J. Q. Smith,
"Commissioner of Indian Affairs,
"Washington, D. C."

Thereafter, on July 5, 1877, the Commissioner of Indian Affairs wrote the Secretary of the Interior in part, as follows:

"Sir: I have the honor to submit herewith, for your consideration and instruction, copy of a letter of the 11th ultimo from E. H. Danforth, United States Indian agent for the White River Ute Reservation in Colorado, complaining of the defiant intrusion of unauthorized white persons upon the northern portion of said reservation, particularly the White River Valley, and of his inability to effectually check or control them.

"There is no military post near said agency, and it is not, therefore, practicable for the agent to obtain the aid of troops upon his own application, and without such assistance he is helpless to prevent the disregard of the territorial rights of said Indians by the intruders in question. The Utes are well known as a brave and warlike tribe, and although now entirely peaceful, the danger as well as injustice of permitting a flagrant violation of their clear treaty rights is very evident.

"The pretext and only possible color of excuse for the intrusion complained of is found in the Miller survey of the northern boundary of said reservation, executed in 1874, which delineated said boundary, as south of the fortieth parallel of north latitude, instead of fifteen miles north thereof, as provided by treaty of March 2, 1868 (15 Stats., 619), and clearly defined by Hayden's geographical survey of that region, which latter survey was based upon observations of latitude and longitude and seems to conform strictly to the treaty. Prior to the Miller survey the Indians were in undisputed possession of the White River Valley as an unquestioned portion of their reservation, but thereafter, and under color thereof, the whites began the encroachments which have at last obtained such magnitude as to demand early attention. In this connection, I respectfully recommend that steps be taken to secure a resurvey in lieu of that executed by Miller, so as to conform to the boundaries defined in the treaty, and thereby remove all possible pretense for unauthorized intrusion upon the reservation. It is recommended, however, that the General Land Office be directed to instruct the register and receiver of the proper district to give public

notice that all lands withdrawn by said executive order are reserved as Indian lands, and are not, therefore, regarded as a part of the public domain for any purpose whatever, and that white settlers thereon are trespassers, and will be removed by the government, with the aid of the military, if necessary.

\* \* \* \* \* \*

"In view of all the circumstances and the grave public interests involved, it is suggested that it may be advisable to submit the matter to the President, with the recommendation that a military force be sent to the White River Valley to insure the faithful observance of the treaty stipulations with the Utes, by removing and keeping away from their reservation all unauthorized persons."

From a study of the record in connection with plaintiff's contentions as to the intention of the treaty of 1868, the Executive Order of November 22, 1875, and the ratification act of June 15, 1880, I am led to the conclusion that the Executive Order of November 22 was not issued and was not intended, in the circumstances, disclosed, to settle a controversy as to the true north boundary line of the Ute Reservation, as intended by art. 2 of the treaty of 1868. In other words, I think the record does not show that in issuing this Executive Order the Government was interpreting art. 2 of the treaty for the purpose of fixing the first standard parallel north as the true north boundary line of the reservation as intended by art. 2 of the treaty of 1868. The language of the Executive Order of November 22 contains the usual language employed in such Executive Orders where public lands are withdrawn from sale and set apart for temporary use for Indian purposes. The language used in the Executive Order of November 22, is the same, or substantially the same, as the language contained in the Executive Order involved in the case of the Sioux Tribe of Indians v. United States, supra. When the agreement of March 6, 1880, was negotiated and made in Washington by the Secretary of the Interior with the chiefs and headmen of plaintiff bands, in which these Indians agreed to use their best efforts to procure the consent of the Ute Indians to cede to the United States "All the territory of the present Ute Reservation in Colorado," and when the Congress accepted and ratified that agreement and provided, in section 3 of the act, for the sale of the ceded lands, it was understood and intended, at least so far as the Government was concerned, that the lands being ceded, and which would be sold for benefit of the Indians, were those lands of the Ute Reservation as defined by art. 2 of the treaty of March 2, 1868, supra, less the part of such reservation in the southern portion thereof which had previously been ceded or sold to the United States under an agreement of September 13, 1873, ratified April 29, 1874, 18 Stat. 36. See Senate Executive Doc., No. 114, March 10, 1880, 46th Cong., 2nd sess.; House Report No. 1401, May 11, 1880, 46th Cong., 2nd sess.

I am unable to find in the record sufficient evidence to support the conclusion that when the Indians made the agreement on March 6, 1880, and thereafter formally accepted the ratification thereof by Congress it was the clear understanding and intention of the parties that the reservation being ceded included any land other than the territory embraced within the north boundary line as specifically defined by art. 2 of the treaty of 1868.

Since, as I have stated above, the President did not, in my opinion, intend by the Executive Order of November 22, 1875, to interpret the treaty and to fix the correct location of the true north boundary line of the reservation at a place other than that called for by the specific language of the treaty, and since the language of the Executive Order and the circumstances under which it was issued did not justify the Indians in believing that the President was interpreting the treaty and establishing the true north boundary line under the treaty, the plaintiff bands are not legally entitled to recover in this case.

The facts as disclosed by the official correspondence before and after the date of the Executive Order of November 22, 1875, with reference to the relations and dealings between the Government and the Indians of plaintiff bands in the north portion of the Ute Reservation indicate that the purpose and reason for the issuance of the Executive Order of November 22, 1875, was to withdraw from public entry or sale such an area of land at the north end of the Ute Reservation for temporary use for Indian purposes as would enable the Indian Agent at the White River Agency to keep white gold prospectors and settlers from intruding upon the Ute Reservation as defined by the treaty of 1868.

In his letter of May 7, 1877, supra, the agent at the White River Agency complained about intrusion upon the Ute Reservation by white settlers and gold prospectors and stated that the line, as surveyed by J. W. Miller, was about seventeen and a half miles south of the true north boundary line of the treaty, fifteen miles north of the fortieth parallel latitude. In his report of May 23, 1877, the Commissioner of Indian Affairs pointed out that the first standard parallel had been surveyed and its location properly marked, and that the area encompassed in the Executive Order for occupancy by the Indians was at least twenty-five miles north of the agency buildings.

The above conclusion that the Executive Order of November 22, the language of the agreement of 1880, and its ratification by Congress, did not vest in plaintiff bands exclusive use and occupancy title to the strip of land in controversy is supported by reference to an Executive Order issued by the President August 17, 1876, with reference to a boundary dispute which arose under the terms of the agreement of September 13, 1873, approved April 29, 1874, supra, in which the President did, on behalf of the United States, interpret the treaty and exclude from the cession certain land, which, according to the lines specified in the agreement, would have been included in such cession. This Executive Order was as follows:

"It is hereby ordered that all that portion of country in the State of Colorado lying within the following-described boundaries and forming a part of the Uncompahgre Park, namely, commencing at the fifty-third mile-post on the north line of the survey of the boundaries of the Ute cession, executed by J. W. Miller in 1875; thence south four miles; thence east four miles; thence north four miles to the said north line; thence west to the place of beginning, be, and the same hereby is, withdrawn from the public domain, and set apart as a part of the Ute Indian reservation, in accordance with the first article of an agreement made with said Indians, and ratified by Congress April 29, 1874. (Stats. at Large, vol. 18, p. 36.)"

For the reasons stated, I concur in the decision dismissing the petition.

MADDEN, Judge, took no part in the decision of this case.