## CONFEDERATED BANDS OF UTE INDIANS *v.* UNITED STATES.

No. 141.   Argued January 14, 15, 1947.—Decided February 17, 1947.

*Ernest L. Wilkinson* argued the cause for petitioners. With him on the brief were *John W. Cragun, Francis M. Goodwin* and *Glen A. Wilkinson.*

*Marvin J. Sonosky* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Bazelon, Roger P. Marquis* and *Fred W. Smith.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioners brought this action in the Court of Claims under the Act of June 28, 1938, 52 Stat. 1209, as amended, 55 Stat. 593, to recover compensation for lands made available to them by an 1875 Executive Order of the President and subsequently taken from them by the United States. Their claim was that by an Act of 1880, Congress had undertaken to sell these lands for the benefit of the petitioners, but that they had never been compensated for them. The Court of Claims, one judge concurring specially, made findings of fact and concluded as a matter of law that petitioners had no compensable interest in the lands because they "never did acquire title to these . . . lands and . . . the Congress never did agree to sell them for the account of" petitioners. 106 Ct. Cl. 33, 51, 64 F. Supp. 569, 571. We granted certiorari, 329 U. S. 694.

The findings of the Court of Claims from official letters, Executive Orders and statutes incorporated in these findings were as follows:

A treaty of 1868, 15 Stat. 619, between the United States and petitioners' ancestors, the Ute Indian tribes, established a reservation for them in Colorado. The northern boundary of the 15 million acres there ceded was described in the treaty as a line fifteen miles north of, and parallel to, the 40th parallel of north latitude. In the 15-mile wide strip north of the 40th parallel lay the White River Valley which had been settled by the Utes as a most suitable place for grazing and cultivation. One of the two Government Indian agencies provided for the reservation by the treaty was established in that strip.

As a result of misunderstandings in 1869 and 1874 between the Utes and white settlers to the north as to the true location of the northern treaty boundary, a survey was made in 1875 by one Miller. Miller's instructions, however, required him to stake out a line which he admitted to the local Indian agent and to the Utes themselves to be fifteen to eighteen miles south of the true boundary described in the treaty. If Miller's line had been correct, it would have excluded from the 1868 reservation the fertile White River Valley, and would have also excluded the agency buildings which had been erected there.

The marking out of the erroneous Miller line greatly upset the Indians because they feared they would be driven from the White River Valley. This embarrassed the local Indian agent who had previously assured the Indians that the White River Valley lay within their reservation. He promptly reported the results of the survey and the reaction of the Indians to the Commissioner of Indian Affairs in Washington, and urged the necessity of a new survey at the earliest practicable date. He stated that if the Miller survey were correct, however, the Indians would be driven from the White River Valley—"the only farming land and . . . stock range . . . in this portion of the Reservation"—and forced to settle on

a river forty miles to the south. The Commissioner, acting on this report and a statement by Miller's attorney that Miller's line was correct, wrote to the Secretary of the Interior that the Miller survey "develops the fact that the White River and surrounding valleys as well as the Agency buildings and improvements at the White River Agency lie north of the . . . boundary and consequently are not within the limits of the . . . Ute Reservation." He therefore recommended to the Secretary that the President be requested to issue an Executive Order to make available to the Utes additional territory north of the 1868 treaty boundary. The President, on the recommendation of the Secretary of the Interior, issued the order.[1]  And thereafter the Commissioner wrote the local agent that the order included "all that tract of country lying between the north boundary of the Ute reservation as defined in treaty of March 2, 1868 . . . which was the boundary surveyed by Mr. Miller . . .  This action fully protects your Indians in the peaceable possession of their improvements in the White River valley and the Agency buildings, and will enable you to assure the Indians of the exact location of the limits of their reservation as enlarged."

[1] The Executive Order of November 22, 1875, 1 Kappler, Indian Affairs, Laws and Treaties, 834 (1904) is as follows:

"It is hereby ordered that the tract of country in the Territory of Colorado lying within the following-described boundaries, viz: Commencing at the northeast corner of the present Ute Indian Reservation, as defined in the treaty of March 2, 1868 (Stats. at Large, vol. 15, p. 619) ; thence running north on the 107th degree of longitude to the first standard parallel north; thence west on said first standard parallel to the boundary line between Colorado and Utah; thence south with said boundary to the northwest corner of the Ute Indian Reservation; thence east with the north boundary of the said reservation to the place of beginning, be, and the same hereby is, withdrawn from sale and set apart for the use of the several tribes of Ute Indians, as an addition to the present reservation in said Territory."

In 1879, several years after the Executive Order was issued, hostilities broke out between some of the Utes and Government representatives in which the Indian agent at White River, all the agency's male employees, and a U. S. military detachment were killed in the so-called "Meeker massacre." H. R. Ex. Doc. No. 1, pt. 5, 46th Cong., 2d Sess. (1879) 16–19, 82–97. There have been charges and countercharges as to who was responsible for inciting these hostilities. Whoever was responsible, it is clear that Congress, aroused by the massacre, took steps to punish the Indians who participated in it, to dispossess the Utes of their reservation, and to remove them from Colorado. Congressional action to accomplish this was provided by the Act of June 15, 1880, 21 Stat. 199, which ratified and embodied an agreement reached earlier that year between the Government and the leaders of the Utes who had promised "to use their best endeavors with their people to procure their consent to cede to the United States all the territory of the present Ute Reservation . . . ." This Act authorized specific allotments to individual Indians from the lands so ceded. But § 3 provided that "all the lands not . . . allotted, the title to which is, by the said agreement of . . . the Ute Indians, and this acceptance by the United States, released and conveyed to the United States . . ." would be restored to the public domain for sale as public lands. The proceeds of the sale of the land so conveyed by the Utes to the United States were, upon satisfaction of indemnity conditions imposed because of the massacre, to be distributed to the Indians. Thereafter, in 1882, an Executive Order declared that the lands withdrawn from the public domain by the Executive Order of 1875 and "set apart for the use of the . . . Ute Indians . . . hereby is, restored to the public domain." 1 Kappler, *supra,* 834–835.

Pursuant to an Act of 1909, 35 Stat. 781, petitioners recovered a judgment for the proceeds of certain lands sold

by the Government, as well as the value of certain lands appropriated by the Government to its own use, all of which were part of the 1868 treaty lands. *Ute Indians* v. *United States,* 45 Ct. Cl. 440, 46 Ct. Cl. 225. Thus, except for certain treaty lands not at issue here, litigation concerning which is now pending in the Court of Claims, the only lands in Colorado for which the Indians have not been paid are those to the north of and outside the 1868 treaty reservation which were made available to them by the Executive Order of 1875. In pursuit of compensation for these Executive Order lands, petitioners have brought this action pursuant to the Act of June 28, 1938, *supra.* That Act confers jurisdiction on the Court of Claims to hear, determine, and render final judgment on all legal and equitable claims of the Utes and to award judgment for the Indians where it is found "that any lands formerly belonging" to them "have been taken by the United States without compensation . . . ."

Petitioners contend here that their predecessors understood that they not only owned the White River Valley lands, but that they also owned the Executive Order lands when, in 1880, they agreed to cede their reservation; and that Congress, by incorporating the agreement in the 1880 Act, thereby ratified it along with the Indians' understanding of it. Petitioners further contend that whether or not Congress intended to obligate the Government to account for the Executive Order lands, they knew of the Indians' understanding so that "the understanding of the Indians having been established," their understanding entitles them to recover. Finally they argue that the Executive Order, unlike the one in issue in *Sioux Tribe of Indians* v. *United States,* 316 U. S. 317, conveyed a compensable interest to these Indians. The Government counters that the President had no power to give a compensable interest to the Indians to lands lying outside the true 1868 treaty boundaries; that if the President intended

to make available lands outside the true boundary it was only to give a transitory, possessory, and not a compensable, interest; that his intent was, in fact, only to secure the Indians in their possession of the White River Valley, but no more, on the mistaken assumption that the White River Valley had been cut off from the reservation by the Miller survey; that the 1880 Act, neither by its terms, its legislative history, nor its administrative interpretation, suggests that Congress intended to ratify or expand the Executive Order or to compensate the Indians for the Executive Order lands; that the Indians did not have a contrary understanding; that in the face of such clear legislative language and intent, a contrary understanding of the Indians, even if established, could not justify a holding that the Indians obtained a compensable interest.

It is conceded that the petitioners have either been, or are currently pressing litigation in the Court of Claims by which they seek to be, compensated for the White River Valley lands, and, in fact, for all of the land which was contained in the true boundaries of the 1868 reservation. The additional claim, insofar as it rests on the Executive Order of 1875, cannot be sustained. For the President had no authority to convey to the petitioners a compensable interest in the lands described in the order lying north of the true 1868 boundary. *Sioux Tribe of Indians* v. *United States, supra.*[2] Nor is there any indication in the findings that the President intended to convey more than a transitory, possessory interest by the 1875 Order. That order made the Indians no more than tenants at the will of the Government on that part of the land outside the true treaty reservation. *Id.* at 331. Moreover, the Court of Claims' findings of fact, as emphasized

---

[2] *Cf.* Executive Order of August 17, 1876, which interpreted a treaty so as to "set apart [certain land] as a part of the Ute Indian Reservation, in accordance with the first article of an agreement made with said Indians and ratified by Congress . . . ." 1 Kappler, *supra,* 834.

by the special concurring opinion, indicate that the Executive Order was promulgated under the mistaken belief that its issuance was necessary in order to give the Indians the use of the White River Valley lands intended to be granted to them by the 1868 treaty and from which they might otherwise have been excluded by the Miller survey. These findings do not indicate that the Commissioner, the Secretary, or the President intended the order to make available the lands it in fact described lying north of the true treaty boundary. The order was designed only to resolve the misunderstanding created by Miller about the White River Valley lands.[3]  The fullest possible purpose of the Executive Order has actually been carried out.  For the Indians' enjoyment of the White River lands was protected during their stay on the reservation, and the lands have either already been paid for, or are the subject of pending litigation in the Court of Claims whereby the Indians seek payment for them.  It is with these things in mind that we must consider petitioners' contention that they have a right to recover compensation because of the 1880 Act.

There is not one word in that Act showing a congressional purpose to convey the Executive Order lands, or any other lands, to the Indians.  On the contrary, the Act embodied a transaction whereby the Indians were the transferors and conveyed lands to the Government.  For the value of lands so conveyed, and for no other, the Government was to make an account to the Indians after certain deductions had been made.

---

[3] The Court of Claims did not find this as an ultimate fact.  But the correspondence which plainly shows it was incorporated in the findings.  This Court has said with reference to findings of the Court of Claims that the "absence of the finding of an ultimate fact does not require a reversal of the judgment if the circumstantial facts as found are such that the ultimate fact follows from them as a necessary inference." *United States* v. *Wells,* 283 U. S. 102, 120.

Nor is it possible to deduce from the 1880 Act a congressional purpose to transform the Executive Order into a conveyance of something more than a mere temporary and cancellable possessory right to the Indians. Neither the language of the 1880 Act, its legislative history, nor the circumstances which brought it about, justify the claim that Congress intended to expand the Executive Order into a transfer of a compensable interest in lands not included in the original treaty reservation. The Act was an aftermath of the "Meeker massacre." With the massacre in mind, Congress decided to remove the Indians from the Colorado reservation as part of the punishment meted out for this tragedy.[4] The very first section of the 1880 Act prohibited any payments at all to the Indians until the Indians involved had surrendered, been apprehended, or until the President had proof that they were dead or outside the United States. Compensation for the families of the massacre victims was to be deducted from the land sale proceeds payable to the Indians. We cannot find from this background a congressional purpose to make a gift to the Indians of the Executive Order lands for which compensation is here sought. The only lands for which Congress agreed in 1880 to compensate the Indians were those "the title to which" the Indians then "released and conveyed to the United States." They could only release and convey the lands that belonged to them, and only the lands given to them by the original 1868 treaty belonged to them. It was for compensation for such lands only that Congress, in 1938, authorized this action to be maintained. Under all these circumstances, the fact that the 1880 Act required the chiefs and headmen to procure the consent of their people to the cession of "the present Ute Reservation" is not sufficient to attribute to Congress

---

[4] See S. 772 and S. Res. 51, 10 Cong. Rec. pt. 1 (1879) 30, 77; H. R. 142, 10 Cong. Rec. 44; H. R. 2420, 10 Cong. Rec. 17; H. R. 154, 10 Cong. Rec. 113; H. R. 5092, 10 Cong. Rec. pt. 2 (1880) 1538.

a purpose to treat as a part of that reservation lands which had never been legally conveyed to the Indians and which had only been made available to them by the Executive Order for the sole purpose of making them secure in their possession of the White River Valley.

It is said, however, that the Indians understood in 1880 that they owned the Executive Order lands which lay north of the White River Valley; that they understood their "present Ute Reservation" to include them; that they understood that Congress undertook by the 1880 Act to sell the lands for their benefit; and that Congress was aware of this understanding. The majority opinion of the Court of Claims stated that "in all probability" this was true. The writer of the concurring opinion thought differently. But even if the Indians had believed that they had a compensable interest in the Executive Order lands, this fact would not necessarily have given it to them. Certainly the absence of presidential authority to give them a compensable title could not be supplied by the Indians' understanding that the President had such authority. The Sioux Indians may also have thought the President had authority to convey title to them; but the reasons on which our decision in the *Sioux* case, *supra,* rested do not indicate that our holding depended in any way upon the understanding of the Indians. Nor can this alleged understanding be imputed to Congress in the face of plain language and a rather full legislative history indicating that the 1880 Act neither conveyed nor ratified conveyance of these lands. While it has long been the rule that a treaty with Indians is to be construed so as to carry out the Government's obligations in accordance with the fair understanding of the Indians, we cannot, under the guise of interpretation, create presidential authority where there was none, nor rewrite congressional acts so as to make them mean something they obviously were not intended to mean. *Choctaw Nation* v. *United*

*States,* 318 U. S. 423, 431–432. We cannot, under any acceptable rule of interpretation, hold that the Indians owned the lands merely because they thought so. Solicitous as the Government is to carry out its promises to the Indians in good faith, we are satisfied from this record that the Government has performed all that it promised.

As we have pointed out, it seems obvious to us from the findings of the Court of Claims that the Executive Order was only intended to secure for these Indians' ancestors possession of the White River Valley lands conveyed to them by the original 1868 treaty, and which was jeopardized by the Miller survey.[5] In fact, the President had no authority to convey a compensable interest in these or other lands to the Utes. Fairly to carry out the 1868 treaty was the order's aim. The 1880 Act, we believe, did not enlarge upon the limited purpose of the Executive Order. To compensate these Indians for lands not intended to be conveyed by the 1868 treaty, the Executive Order, nor the 1880 Act, would be to pay them for lands which neither they nor their ancestors ever owned and to which they had no claim in equity or justice, so far as the transactions here at issue are concerned. No rule of construction justifies such a result.

*Affirmed.*

Mr. Justice Murphy, dissenting.

The United States, in my opinion, is morally and legally obligated to pay for the land in issue in this case. The Executive Order of 1875 by its terms set aside certain land up to the "first standard parallel north" for the use of the Ute Indians "as an addition to the present reservation." That order alone, of course, could convey no compensable interest to the Indians under the rule of *Sioux Tribe* v. *United States,* 316 U. S. 317. But events subsequent to

---

[5] See p. 177, *supra.*

the issuance of the Executive Order in this case make inapplicable the principle of the *Sioux* case. In 1880 the United States and the Ute chiefs and headmen entered into an agreement whereby the latter promised "to use their best endeavors with their people to procure their consent to cede to the United States all the territory of the present Ute Reservation in Colorado." Congress thereupon passed the Act of June 15, 1880, which recited in its preamble that the chiefs and headmen had "submitted to the Secretary of the Interior an agreement for the sale to the United States of their present reservation in the State of Colorado." The Act then incorporated the agreement previously made and provided that all unallotted lands should be deemed to be released and conveyed to the United States.

It seems clear to me that by 1880 the term "present reservation" included the land which the Executive Order of 1875 stated had been set aside as an addition to the then present reservation. And when the 1880 agreement and the 1880 Act referred to "present reservation" they must have included that additional land. Adding this informal acknowledgment by Congress of the expanded reservation to the occupation of the land by the Indians and their understanding that it belonged to the reservation, a compensable interest becomes evident. It is immaterial that there were no formal documents conveying a fee simple interest to the Indians; it is likewise irrelevant that there was no formal acknowledgment of the Indian title. *Spalding* v. *Chandler*, 160 U. S. 394; *United States* v. *Alcea Band of Tillamooks*, 329 U. S. 40. It is enough that the Indians had the right to possess and occupy the land and that the Indians fairly understood that to be the case. An acknowledgment by Congress, however informal, then adds a legal obligation to the moral duty of the United States to pay for the land involved. Such is the situation here.

The Court indicates, however, that the Executive Order of 1875 does not mean what it says. It clearly set apart for the use of the Indians "as an addition to the present reservation" all the described land up to the "first standard parallel north." But it is now suggested that those responsible for the promulgation of that order did not really intend to set aside all the land up to the "first standard parallel north," despite the explicit language used. It is said, rather, that the order actually was designed to affect only the White River Valley lands—lands which are some nine miles south of the "first standard parallel north." That interpretation of the intent of the framers of the order would make the northern boundary of the Executive Order land coterminous with the northern boundary of the true treaty reservation.

But there is nothing in the findings of the Court of Claims to justify such an interpretation. To disregard the plain words of the order by subtracting a nine-mile strip from a clearly worded description requires definite findings to that effect which are supported by the record. It is not our function, of course, to supply those findings ourselves. Nor can we infer them from the decision of the Court of Claims. That court alone has the power and the duty to make the necessary findings on material issues. 53 Stat. 752, 28 U. S. C. § 288; *United States* v. *Causby,* 328 U. S. 256, 267–268. If it is material that the framers of the Executive Order intended to set aside less land than that described in the order, the case should be remanded to the Court of Claims so that it can make the necessary findings in this respect.

Mr. Justice Frankfurter and Mr. Justice Douglas join in this dissent.