**SKOKOMISH INDIAN TRIBE,**
*Appellant,*

v.

**E. L. FRANCE, Trustee, et al., Appellees.**

No. 17933.

United States Court of Appeals
Ninth Circuit.

July 27, 1963.

Little, Palmer, Scott & Slemmons, Keith M. Callow, Frederick Paul, and Malcolm S. McLeod, Seattle, Wash., for appellant.

Skeel, McKelvy, Henke, Evenson & Uhlmann, and William E. Evenson, Seattle, Wash., for appellees, Carlson, Strine, Greeley, Macke, John W. Phillips and Jean S. Phillips.

Gordon, Goodwin, Sager & Thomas, Tacoma, Wash., for appellees, Frances Nalley & Puget Sound National Bank, Executor of estate of Marcus Nalley, deceased.

Marshall McCormick, Robert R. Hamilton and Paul J. Nolan, Tacoma, Wash., for appellee City of Tacoma.

Ryan, Askren, Carlson, Bush & Swanson, and Raymond C. Swanson, Seattle, Wash., for appellees Simpson Logging Co.

Before JERTBERG and BROWNING, Circuit Judges and JAMESON, District Judge.

JAMESON, District Judge.

Appellant, an Indian tribe incorporated under an Act of Congress,[1] brought this action to establish a claim of title to a strip of tidelands adjoining its reservation on the Hood Canal and the Skokomish River in western Washington. Appellant's claim is based upon a treaty between the United States and certain Indian tribes dated January 26, 1855, proclaimed April 29, 1859 (12 Stat. 933), and an executive order dated February 25, 1874. Appellees claim title through various conveyances from the State of Washington. The case was tried before the court without a jury. Pursuant to findings of fact and conclusions of law in favor of appellees, a judgment and decree was entered dismissing plaintiff's complaint with prejudice and quieting title in the respective appellees.

The district court had jurisdiction by virtue of 28 U.S.C. § 1331, as held in Skokomish Indian Tribe v. France, 9 Cir., 1959, 269 F.2d 555. This court has jurisdiction under 28 U.S.C. §§ 1291 and 1294.

The primary issue is whether the tidelands were included within the lands set apart for the use of the Indian tribe under the executive order made pursuant to the treaty. It is conceded that neither the treaty nor the executive order expressly described the tidelands at issue. Article II of the treaty reads in pertinent part:

"There is, however, reserved for the present use and occupation of the said tribes and bands the following tract of land, viz.: the amount of six sections, or three thousand eight hundred and forty acres, situated at the head of Hood's Canal, *to be hereafter set apart, and so far as necessary surveyed and marked out for their exclusive use; * *.*" (Emphasis added.)

The executive order of February 25, 1874, reads:

"It is hereby ordered that there be withdrawn from sale or other disposition and set apart for the use of the S'Klallam Indians the following tract of country on Hood's Canal in Washington Territory, inclusive of the six sections situated at the head of Hood's Canal, reserved by treaty with said Indians January 26, 1855 (Stats. at Large, vol. 12, p. 934), described and bounded as follows: *Beginning at the mouth of the Skokomish River;* thence up said river to a point intersected by the section line between sections 15 and 16 of township 21 north, in range 4 west; thence north on said line to a corner common to sections 27, 28, 33 and 34 of township 22 north, range 4 west; thence due east to the southwest corner of the southeast quarter of the southeast quarter of section 27, the same being the southwest corner of A. D. Fisher's claim;

---

1. Act of June 18, 1934 (48 Stat. 984) as amended by Act of June 15, 1935 (49 Stat. 378).

thence with said claim north to the northwest corner of the northeast quarter of the southeast quarter of said section 27; thence east to the section line between sections 26 and 27; thence north on said line to corner common to sections 22, 23, 26 and 27; *thence east to Hood's Canal; thence southerly and easterly along said Hood's Canal to the place of beginning.*" (Emphasis added.)

Official surveys of the reservation boundaries were made in 1862 and again in 1873, and the balance of the public lands in the vicinity of Hood's Canal in 1873.

There is no evidence that prior to the commencement of this action in 1948 appellant and its members had asserted title to the tidelands in controversy. The State of Washington began selling the tidelands about 1901. Appellees and their predecessors in title have occupied the lands continuously since their acquisition, have paid taxes thereon, and have made extensive improvements upon portions of the land.

■ It is the general rule at common law that where the shore or shoreline of a body of navigable water is designated as a boundary, the high water mark is the limit of the boundary line. This rule was established in the early case of United States v. Pacheco, 1865, 2 Wall. 865, 866, 69 U.S. 587, 590, 17 L.Ed. 865, where the Court said:

"The position, that by the bay as a boundary, is meant, in this case, the line of low water mark, is equally unfounded. By the common law, the shore of the sea and, of course, of arms of the sea, is the land between ordinary high and low water mark, the land over which the daily tides ebb and flow. When, therefore, the sea or a bay is named as a boundary, the line of ordinary high water mark is always intended where the common law prevails."

Appellant contends, however, that the ordinary rule should not be applied in this case; that the treaty and executive order defining the reservation are ambiguous; that the ambiguity must be resolved by construing the language of the instruments as they would naturally be understood by the Indians at the time; that the tidelands were essential to the Indians' livelihood and accordingly the Indians must have understood that they were to have the tidelands; that the surveys which excluded the tidelands from the reservation were ineffectual and must be ignored.

■ The rule applicable to the construction of treaties with Indian tribes was well summarized in Choctaw Nation v. United States, 1943, 318 U.S. 423, 431–432, 63 S.Ct. 672, 677–678, 87 L.Ed. 877, where the Court said:

"Of course, treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties. (Citing cases.) Especially is this true in interpreting treaties and agreements with the Indians; they are to be construed, so far as possible, in the sense in which the Indians understood them, and 'in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.' (Citing cases.) *But even Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties.* (Citing cases.)" (Emphasis added.)

See also Ute Indians v. United States, 1947, 330 U.S. 169, 67 S.Ct. 650, 91 L.Ed. 823; and Northwestern Bands of Shoshone Indians v. United States, 1945, 324 U.S. 335, p. 353, 65 S.Ct. 690, p. 699, 89 L.Ed. 985; where the Court said:

"Petitioners suggest that in the construction of Indian treaties we, as a self-respecting nation, hesitate

to construe language, which is selected by us as guardian of the Indians, to our ward's prejudice. 'All doubts,' say petitioners, 'must be resolved in their [the Indians']. favor.' Mr. Justice McLean, concurring in Worcester v. Georgia, 6 Pet. 515 at 582 [8 L.Ed. 483], said, 'The language used in treaties with the Indians should never be construed to their prejudice.' But the context shows that the Justice meant no more than that the language should be construed in accordance with the tenor of the treaty. That, we think, is the rule which this Court has applied consistently to Indian treaties. We attempt to determine what the parties meant by the treaty. We stop short of varying its terms to meet alleged injustices. Such generosity, if any may be called for in the relations between the United States and the Indians, is for the Congress."

The pertinent findings of the trial court with respect to the treaty, executive order, surveys, the nature of the tidelands, and the use of the tidelands by the Indian tribe are as follows:

"2. The treaty (Exhibit 3) does not describe the tidelands in issue.

"3. The executive order defines the boundary of the reservation along Hoods Canal as 'thence southerly and easterly along said Hood's Canal to the place of beginning'. The executive order does not describe the tidelands in issue in this case, nor purport to include the same in the description of the reservation. (Exhibit 4).

"4. The exterior boundaries of the Skokomish Reservation referred to in the executive order were surveyed and the easterly and northerly boundary along Hood Canal was defined and surveyed as the meander line along such waters as established by such official government surveys. (Defendants' Exhibit A–14–1, Document B; Defendants' Exhibit A–9; Plaintiff's Exhibit 5-f).

"5. The original reservation selected by actual occupancy and use by the government officials in charge of the Indians on Hood Canal did not reach as far north as the common boundary to Sections 35 and 26 in Township 22 North, Range 4 West, but was bounded on the north margin by the south boundary of the A. D. Fisher Donation Claim (Exhibit 7; A–10; Plaintiff's Exhibit 12; Defendants' Exhibit A–14–1). The recommendations of the government officials to the President were to enlarge the then reservation by adding thereto the A. D. Fisher Donation Claim. The Fisher Donation Claim included all the Hood Canal frontage in said Section 26 and a portion of Section 35 north of the area up to then selected for and used as a reservation. The executive order legal description included the area in the A. D. Fisher Donation Claim.

"6. Other executive orders of the same period, both before and after the executive order here in issue, used varied wording to describe boundaries along navigable waters, and in the case of other executive orders, the boundaries are sometimes defined as extending to 'low water mark'. (Defendants' Exhibit A–1).

"7. The treaty (Exhibit 3) reserves for use and occupancy of the Indians six sections or 3,840 acres 'situated at the head of Hood's Canal, to be *hereafter* set apart, and so far as necessary *surveyed* and *marked* out * * *'. There is no evidence of why or when the mouth of the Skokomish River at the bulge of Hood Canal at Annas Bay was selected rather than the mouth of the Union River at the head of Hood Canal at the location of the present Town of Belfair. Some early mission settlements for Indian affairs were at the Union River location on the Canal.

"Nothing is reflected in the minutes of the proceedings concerning the treaty or in the history of the event or in any of the evidence to show what location was thereafter to be set aside for Indian use

as a reservation other than 3,840 acres 'at the head of Hood's Canal'. No evidence shows any understanding or intention or consideration of whether actual tidelands at the site in litigation or at any other site were to be included in the 3,840 acres. The actual reservation was 4,173.31 acres (Exhibit A–14–1). Such acreage was computed shoreward of the meander line.

"8. Title to submerged land under navigable waters vested in the State of Washington upon its admission into the Union and was held by the United States previously thereto in trust for the State to be formed (except only for such disclaimers as appear in the State Constitution adopted conformable to the Enabling Act of the Congress).

"9. The reservation abutting on Hood Canal was surveyed and divided into Indian lots and pursuant to due proceedings in that behalf the same were allotted to various individual Indians who in turn by due proceedings approved by the necessary government authorities sold such Indian lots and conveyed title thereto to defendants' predecessors in title. (Admitted Fact VI; Pretrial Order, Page 19, et seq.)

"10. The entire frontage of the Skokomish Reservation along Hood Canal was thus disposed of by allottees and no portion of such frontage remains in the reservation. (Hanson Map, Exhibit A–59; Admitted Fact VI; Exhibit A–21; A–63; A–64; A–25 to A–35; and A–2.).

\* \* \* \* \* \*

"14. At the time of the treaty and at the time of the executive order, the Indians for whose benefit the same were made were dependent for their livelihood in part upon fish. The major and primary fish so used was salmon. The only foods referred to as of concern to the Indians in the minutes of the treaty negotiations were 'berries, deer and salmon'.

"15. The salmon were easily procured in the rivers and creeks, particularly in the Skokomish River, and were ordinarily caught there with traps. The Indians had their basic villages up the rivers in sheltered wooded areas, close to the rivers and creeks where salmon abounded and other game was readily procurable. Migration by the Indians was primarily governed by salmon runs in various seasons of the year according to species running in other parts of Hood Canal and in other rivers and creeks tributary thereto.

"16. The Skokomish villages were primarily at the juncture of the north fork of the Skokomish River and the south fork of the Skokomish River and on Vance Creek west of that fork, which is up the Skokomish River westerly of the reservation and many miles from the tidelands in issue. (Exhibit A–62, Pages 6–143 and 6–144; Elmendorf Exhibit 60, Pages 32 to 37, Geographic Sites 1 to 32 and map opposite Page 48).

"17. No salmon creek or river entered Hood Canal across the tidelands in issue except the Skokomish River. (Exhibit 60, Page 38–39; Exhibit 36; Exhibit 5; Exhibit 41).

"18. Shell fish were used by the Indians at the time of the treaty and executive order, but to a limited extent, and more as a delicacy, and the livelihood of the Indians was not dependent in material degree upon shell fish or any type of fishing on or from the tidelands in issue.

"19. The usual locations at which shell fish were procured were miles from the reservation and were reached by canoe travel on Hood Canal. \* \* \*

"20. The tidelands in issue, particularly in Section 26, are not and were not a source of native shell fish in usable quantities.

"21. The tideland strip in Section 26 is narrow, rocky and gravelly. Exploration for shell fish within such strip is onerous and unrewarding.

"22. The salinity of the waters of Annas Bay on Hood Canal on which the reservation abuts is below that permitting shell fish to thrive and below that at

which some species can survive. The entire Annas Bay salinity is affected by the discharge of the Skokomish River into the Bay, which is the largest fresh water inlet into Hood Canal, and with each turn of the tide the fresh waters of the river wash the tidelands in issue. (Dr. Stein Testimony; Exhibit A–49 to A–58; Testimony of Alice Hanson and Wallace Hanson).

\* \* \* \* \* \*

"34. The land and legal descriptions of land contained and mentioned in the treaty and the executive order and in the surveyor's notes and surveys and in Bureau and departmental correspondence and records did not contain, mention or include tidelands or tidal waters, and nothing therein grants, gives or conveys or reflects an intention to grant, give or convey to plaintiff or to any predecessor of plaintiff any right, title or interest in or to any land not therein described, nor to any tidelands or submerged lands or properties claimed herein by defendants."

These findings fully sustain the district court's conclusion that "the tidelands involved in this action are not a part of the Skokomish Indian Reservation" and that the "State of Washington acquired title to the tidelands \* \* \* upon the admission of that state into the Union". Unless clearly erroneous the findings must be accepted by this court. Rule 52, F.R.Civ.P. "It is not the function of this court to retry cases on appeal." Glens Falls Indemnity Company v. United States, 9 Cir., 1955, 229 F.2d 370, 373. After reviewing the record in its entirety, it is our conclusion that the findings are not clearly erroneous, but on the contrary are amply supported by the evidence.

The use of the tidelands by the Indian tribe, as disclosed by the evidence, does not support appellant's contention that the tidelands were essential to the Indians' livelihood and that the Indians accordingly must have understood they were to have the tidelands. The minutes of the treaty negotiations [2] contain no reference to tideland ownership; nor to the use of shell fish as food. Initially many members of the tribe objected to the proposed treaty. They were concerned with possible loss of their sources of food—"berries, deer and salmon". The first to speak said in part: "I wish to speak my mind as to selling the land. Great Chief! What shall we eat if we do so? Our only food is berries, deer and salmon—where then shall we find these? I don't want to sign away all my land, take half of it, and let us keep the rest. I am afraid that I shall become destitute and perish for want of food." (Ex. 10).

After the Indians had been assured that the reservation would only be a place at which they must make their homes, the Indians discussed the proposal among themselves and on the following day assented to the treaty. At that time one of the tribe said: "My heart is good. I am happy since I have heard the paper read and since I have understood Gov. Stevens, particularly since I have been told that I could look for food where I pleased and not in one place only. \* \* \* We are willing to go up the Canal since we know we can fish elsewhere. We shall only leave there to get salmon, and when done fishing will return to our houses." (Ex. A–8.)

It is clear that the reservation was intended only as a residence, and the Indians were to remain free to roam and fish at their usual places.[3] From the testimony of the Indian witnesses and

2. In the treaty negotiations, conducted at Point No Point, Governor Isaac Stevens represented the United States. At a meeting on January 25, 1855, the treaty was read and interpreted to the Indians, followed by statements of various Indians and explanations of the terms of the treaty by Governor Stevens and his as-

sistants. The treaty was signed on January 26.

3. The right to fish was granted by Article IV of the treaty, viz., "The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians, in common with all citizens of the United States; and of erecting tempo-

the many historical documents and works in evidence, it is apparent that the Skokomish Indians roamed extensively over the Hood Canal, following seasonal fishing. Their primary sources of food were the different species of salmon which abounded in the streams entering the canal. They were both an inland and salt water people. One group, the Vance Creek settlement, lived almost entirely an inland-riverine existence, while the lives of the others centered upon river settlements in winter and upon Hood Canal in the summer.

It is true that shellfish and other forms of sea life were gathered by the Skokomish along the canal. While there is some conflict in the testimony of the Indian witnesses, the evidence clearly preponderates in favor of the trial court's findings "That the usual locations at which shellfish were procured were miles from the reservation and were reached by canoe travel on Hood Canal"; and "That the tidelands in issue, particularly in Section 26, are not and were not a source of native shellfish in usable quantities."

Appellant relies heavily upon Exhibit 60, excerpted from research studies of Dr. W. W. Elmendorf, a well qualified expert in the field of ethnology or cultural anthropology, who did considerable discriminating research among the Skokomish Indians. But Dr. Elmendorf's studies, when closely examined, support the findings of the trial judge. According to Dr. Elmendorf, the Skokomish were part of a group of Indians living along the shores of Hood Canal, which

he termed "Twana" Indians. He says in pertinent part:

"The most important source of food for all Twana was Pacific salmon, four species of which were common in the canal and ran in its tributary streams. * * * The bulk of the salmon catch was made in rivers, with weirs, dip nets, and harpoons, during late-summer and fall runs. Salt-water trolling and netting was of minor importance, in particular to the Skokomish with their large river runs of salmon.

*　　*　　*　　*　　*

"River fishing for all these fish (king, silver, humpback, dog and steelhead) was primary, with weirs and associated dip-net structures the most productive method. Salmon, as well as other types of fish, were also trolled for with hook and line from canoes in salt water, but this method furnished a relatively small proportion of the catch." Ex. 60, pp. 57 and 60.

*　　*　　*　　*　　*

"Women gathered molluscs during the warmer months of the year, using for clam digging the same digging stick employed for roots and open work baskets carried by a tumpline. Some species, particularly clams, were obtained in large quantities and furnished an important part of the Twana diet.

*　　*　　*　　*　　*

"Clam digging started in May in the region at the head of Hood Canal

rary houses for the purpose of curing; together with the privilege of hunting and gathering roots and berries on open and unclaimed lands."

4. The reference is to the geographic site located and described in an earlier portion of the work (Ex. 60). Dr. Elmendorf set forth at pp. 32–55 of the exhibit a list of geographic sites identified by their Indian names which were important in the life of these Indians before they were

placed on the reservation. He indicated the location of these sites by number on a map, which appears opposite page 48 of the exhibit. Dux$^w$le 'lap is site No. 128 and is identified as "'place at the farthest-in tail end (of the water).' * * * An extended-area term for all the territory at the head of Hood Canal; in specific reference, the actual end of the inlet, the mouth of the Union River." (See Ex. A-62.)

(dux^wle' lap) [4] and continued through the summer. As the season grew later the best clam beds were found farther down the canal; the latest intensive clam digging was in August on beaches in the area termed slca'wks,[5] on the east shore of the lower (northern) canal. Here work parties from various Twana village communities foregathered in the late summer." Ex. 60, p. 123.

Both of these sites are several miles from the reservation.

We agree with the following summary of the trial judge in his unpublished memorandum opinion:

"Allowing in full measure for the inequalities of understanding and position of the parties negotiating the treaty and giving full effect to the rules of treaty construction favoring the primitive Indians, on the entire record in the present case this court is fully satisfied that not any one of the parties negotiating the treaty of 1855 had the slightest thought or intention that the treaty or the executive order to follow would vest ownership to the tidelands in question in the Skokomish or in any other Indian tribe. On the contrary, the record of negotiations, the language and substance of the treaty, the specific terms of the executive order, and all pertinent circumstances shown by the evidence negative understanding or intent to such effect by any of the parties negotiating the treaty or concerned with or by the order. Considering the absence of support for any such contention, the long delay in any mention or assertion thereof is not surprising."

The cases upon which appellant relies are distinguishable. In Alaska Pacific Fisheries v. United States, 1918, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138, Congress had set apart "a body of lands known as the Annette Islands." It was held that the reservation included the adjacent fishing waters and submerged land, the court finding that the adjacent fishing grounds were essential to the subsistence and economic development of the tribe and accordingly Congress must have intended to include them. In United States v. Moore, W.D.Wash. 1945, 62 F.Supp. 660, aff'd 9 Cir., 157 F.2d 760, the United States, by treaty, agreed with the Indians to reserve "a tract or tracts of land sufficient for their wants". The executive order setting apart the tract was silent as to any rights in the bordering waters. The court held that the treaty and executive order should be construed to include the lands under the adjoining waters, because the record established that they were fish-eating Indians dependent for their sole means of support upon the continued use of those waters, from which they caught their fish.

The distinction between those cases and the instant case is one of fact and readily apparent. Here the trier of facts has found, upon substantial evidence, that the tidelands were not essential to the livelihood of the Indians at the time of the treaty and the executive order providing for the reservation. It is clear from the record that the reservation was not intended to support these Indians, as was the case in Alaska Pacific Fisheries v. United States, or to be "sufficient for their wants", as was the expressed intention of the treaty in United States v. Moore.

Nor is this a case such as Northern Pacific Railway Company v. United States, 1913, 227 U.S. 355, 33 S.Ct. 368, 57 L.Ed. 544,[6] or United States v. Ro-

5.  Slca'wks refers to site No. 176, "The east shore of Hood Canal from Bangor (King Spit) north of Port Gamble". (See Ex. A–62.)

6.  In Northern Pacific Railway Company v. United States the Supreme Court affirmed

a construction of a treaty between the United States and the Yakima Indians, establishing the western boundary of the Yakima Reservation at the *main* ridge of the Cascade Mountains, rather than at a lesser ridge which would reduce the size of the reservation. While the treaty

maine, 9 Cir., 1919, 255 F. 253,[7] where surveys were found to be inconsistent with the understanding of the parties to the treaties and where the applicable documents contained language supporting the boundary claims of the Indians. The documents and historical background material in this case do not manifest an intention of the treaty makers to include the tidelands in the Skokomish Reservation. Accordingly, title to the tidelands vested in the State of Washington upon its admission to the Union and passed subsequently to the appellees. See United States v. Holt State Bank, 1926, 270 U.S. 49, 46 S.Ct. 197, 70 L. Ed. 465.

As the trial judge pointed out in his memorandum opinion, a claim is pending with the Indian Claims Commission whereby the Skokomish Tribe seeks an award for alleged inadequate compensation for the lands ceded under the 1855 treaty. If, in fact, the treaty and executive order did not make adequate provision for the tribe, compensation can and presumably will be awarded by the Commission.[8]

Our conclusion on the primary issue fully disposes of the case and renders it unnecessary to extend this opinion further by discussion of the other issues raised and argued by the parties.

Judgment affirmed.

was susceptible to other construction, it contained the following language in the boundary description: "thence along the southern tributary to the Cascade Mountains; thence southerly along the *main* ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickitat and Pisco rivers; * * *." (Emphasis added.) 227 U.S. at 357, 33 S.Ct. at 369–370, 57 L.Ed. 544.

7. In United States v. Romaine this court said in pertinent part: "The intention to reserve to the Indians the possession of the land to low-water mark is made evident by the terms of the proclamation, for one of the courses on the west side of the island runs 'to the low-water mark on the shore of the Gulf of Georgia, then southerly and easterly along the said shore with the meanders thereof, across the western mouth of Lummi river, and around Point Francis.'" 255 F. at 259.

8. As the trial court well said: "The defendants in the instant case purchased and substantially improved their properties in complete good faith and without the slightest knowledge, actual or constructive, of the title claim now so belatedly asserted. Whatever public atonement for early day wrongs may be due the Skokomish Indians, granting the relief sought in the present case is not justified by the evidence presented or by the law applicable thereto."