SKOKOMISH INDIAN TRIBE, a federally recognized Indian tribe in its own capacity as a class representative and as parens patriae; Denny S. Hurtado; Gordon A. James; Joseph Pavel; Anne Pavel; Maures P. Tinaza; Celeste F. Vigil; Roslynne L. Reed; Gary W. Peterson; Rita C. Andrews; Tom G. Strong; Marie E. Gouley; Victoria J. Pavel; Dennis W. Allen; Joseph Andrews, Sr.; Zetha Cush; Elsie M. Allen; Alex L. Gouley, Jr.; Lawrence L. Kenyon; Doris Miller; Gerald B. Miller; Helen M. Rudy; Ronald D. Twiddy, Sr.; Nick G. Wilbur, Sr., Petitioners–Appellants,

v.

UNITED STATES of America; Tacoma Public Utility, a Washington municipal corporation; City Of Tacoma, a Washington municipal corporation; William Barker, Tacoma Public Utilities Board Member in his official capacity; Tom Hilyard, Tacoma Public Utilities Board Member in his official capacity; Robert Lane; Tim Strege; G.E. Vaughn, Defendants–Appellees.

Skokomish Indian Tribe, a federally recognized Indian tribe in its own capacity as a class representative and as parens patriae; Denny S. Hurtado; Gordon A. James; Joseph Pavel; Anne Pavel; Maures P. Tinaza; Celeste F. Vigil; Roslynne L. Reed; Gary W. Peterson; Rita C. Andrews; Tom G. Strong; Marie E. Gouley; Victoria J. Pavel; Dennis W. Allen; Joseph Andrews, Sr.; Zetha Cush; Elsie M. Allen; Alex L Gouley, Jr.; Lawrence L. Kenyon; Doris Miller; Gerald B. Miller; Helen M. Rudy; Ronald D. Twiddy, Sr.; Nick G. Wilbur, Sr., Skokomish Indian Tribal members for themselves and all others similarly situated, Plaintiffs–Appellants,

v.

Tacoma Public Utility, a Washington municipal corporation; City of Tacoma, a Washington municipal corporation; William Barker, Tacoma Public Utilities Board Member in his official capacity; Tom Hilyard, Tacoma Public Utilities Board Member in his official capacity; Robert Lane; Tim Strege; G.E. Vaughn; United States Internal Revenue Service, Defendants–Appellees.

Nos. 01–35028, 01–35845.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 6, 2003.

June 3, 2003.

Mason D. Morisset, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA, for the Petitioners–Appellants.

Phillip H. Lynch, Assistant United States Attorney, Tacoma, WA, for the Defendants–Appellees.

J. Richard Creatura, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, P.L.L.C. (Tacoma Public Utility), Tacoma, WA, for the Defendants–Appellees.

Timothy L. Ashcraft, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, P.L.L.C. (Tacoma Public Utility), Tacoma, WA, for the Defendants–Appellees.

Before: WALLACE, TROTT, and TASHIMA, Circuit Judges.

Opinion by Judge TROTT; Opinion concurring in part and dissenting in part by Judge TASHIMA.

TROTT, Circuit Judge.

The Skokomish Indian Tribe ("Skokomish Tribe") and individual tribe members (collectively "Tribe") brought this action against the City of Tacoma ("City"), Tacoma Public Utilities ("TPU"), and individual board members of TPU ("Board"), (collectively "Tacoma"), and the United States alleging they were harmed by the Cushman Hydroelectric Project ("Project") owned by the City.[1] The Project includes two dams, two reservoirs, diversion works, two power houses, transmission lines, and it floods over thirty acres of federal land within a total project area of 4,700 acres. In Case No. 01–35028, the Tribe appeals the district court's denial of its motion to certify a class of tribe members who allege

---

1. The Tribe is seeking almost $6 billion in monetary damages.

they were harmed by the Project. In Case No. 01–35845, the Tribe appeals the district court's orders (1) denying the Tribe's recusal motion, (2) dismissing the United States as a defendant, (3) granting summary judgment in favor of Tacoma on the Tribe's claims asserted against Tacoma; and (4) dismissing the Tribe's 16 U.S.C. § 803(c) cause of action for failure to state a claim upon which relief can be granted.

We have jurisdiction under 28 U.S.C. § 1291 over the Tribe's timely appeal in 01–35845, and we affirm, in part, and vacate and remand with instructions to the district court to dismiss in part. Because of our holding with respect to the Tribe's appeal in 01–35845, we need not address the Tribe's appeal in 01–35028.

## BACKGROUND

### A.

On January 26, 1855, Governor Isaac I. Stevens ("Stevens"), Governor of the Washington Territory, negotiated the Treaty of Point No Point ("Treaty") with the Tribe. The Treaty ceded territory belonging to the Tribe to the United States and reserved a tract of land for the Tribe. In Article 4, the Treaty provides: "[t]he right of taking fish at usual and accustomed grounds and stations is further secured to said Indians, in common with all citizens of the United States; ... together with the privilege of hunting and gathering roots and berries on open and unclaimed lands." The Treaty was one of several negotiated by Stevens on behalf of the United States with various Pacific Northwest Indian Tribes between 1854 and 1855. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 661–62, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The treaties extinguished tribal claims to portions of what is now Washington State in exchange for monetary payments. *Id.*

### B.

In 1923, the City filed an application to license the Project with the Federal Power Commission, a predecessor to the Federal Energy Regulatory Commission ("FERC").[2] The application described the Project virtually as it remains today. In 1924, FERC issued a 50 year "minor part" license to the City pursuant to the Federal Water Act of 1920 ("FWA"), now codified as Part I of the Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.* The license authorized the flooding of 8.8 acres of federal land in connection with the City's construction of the Project, which was only a part of the entire Project. As required by § 4(d) of the FWA, FERC stated in its license that the Project "will not interfere or be inconsistent with the purpose for which any reservation affected thereby was created or acquired."[3]

The original license was limited to a minor part of the Project because the then-current legal view was that FERC only had authority to issue licenses for the occupancy and use of federal lands. *Pacif-*

---

**2.** FERC is used throughout this opinion to refer to FERC and the Federal Power Commission.

**3.** Section 4(d) is now codified as 16 U.S.C. § 797(e), and the statutory language has remained the same:

That licenses shall be issued within any reservation only after a finding by the commission that the license will not interfere or

be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation.

*ic Gas & Elec. Co.*, 29 F.P.C. 1265, 1266, 1963 WL 4558 (1963); *City of Tacoma*, 67 F.E.R.C. 61,152, 1994 WL 170164 (1994). In 1963, FERC reconsidered this view, concluding that its authority "runs to the 'project works'; i.e., the dams, reservoirs, power-houses, etc., themselves, and not to the mere occupancy and use of the government lands involved, as was the expressed purpose of these licenses." *Pacific Gas,* 29 F.P.C. at 1266.

In light of FERC's decision that it had authority to license entire projects where only a minor part occupies federal land, in 1974 the City filed an application for a new license in the form of an application for a major project license encompassing the entire Project.[4] *City of Tacoma,* 67 F.E.R.C. 61,152, 1994 WL 170164 (1994). The Tribe was granted the right to intervene in the relicensing proceedings, and twenty-four years of litigation followed.

In 1992, the Tribe filed a petition with FERC for a declaratory order that the City's relicensing application was an original license proceeding because the 1924 license was only for a minor part of the Project. *Id.* FERC held that although it issued only a minor-part license in 1924, the issuance was consistent with FERC's interpretation of its jurisdiction at that time and the proceeding for a license of the entire Project was "appropriately characterized as a relicensing proceeding." *Id.* FERC also noted that "the Commission's initial failure to issue a license for the complete project was founded upon a mistaken view of the law and the facts." *Id.* Accordingly, in 1998, FERC issued a subsequent license for the entire Project, which included the required finding that the Project "will not interfere or be inconsistent with the purpose for which any

reservation affected thereby was created or acquired." *City of Tacoma,* 84 F.E.R.C. 61,107, 1998 WL 608611 (1998). In the administrative proceeding, FERC addressed within context of the FPA the same contentions raised by the Tribe that they raise in this case. *Id.*

The parties eventually petitioned for review of FERC's licensing order to the United States Court of Appeals for the District of Columbia, which remanded to FERC for further development of the record. *City of Tacoma v. FERC,* 2000 WL 1683468 (D.C.Cir.2000). That case is still pending.

## DISCUSSION

### A.

### Orders Denying the Tribe's Recusal Motion

 We review the district court's denial of the Tribe's recusal motion for an abuse of discretion. *Kulas v. Flores,* 255 F.3d 780, 783 (9th Cir.2001). An abuse of discretion is "a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." *Wing v. Asarco, Inc.,* 114 F.3d 986, 988 (9th Cir.1997).

Sixteen months after filing its complaint, and after numerous issues had been resolved by the district court, the Tribe wrote a letter to Judge Burgess informing him of an opinion following the federal judiciary's Code of Conduct. The Tribe quoted the following part of the opinion in its letter:

A judge's status as a utility customer does not indicate recusal in cases involving the utility, unless the outcome of the

---

4. FERC subsequently confirmed that holders of minor-part licenses for hydroelectric projects would be required to file license applica-

tions covering all project works. *Pacific Gas & Elec. Co.,* 56 F.P.C. 994, 1008, 1976 WL 14641 (1976).

case could substantially affect the judge's utility bill. A ten dollar per month increase is one which might reasonably be considered substantial and accordingly recusal was suggested.

Judge Burgess denied recusal on the ground that the motion was untimely. The Tribe moved to reconsider, and Judge Burgess again denied recusal but acknowledged he was a TPU ratepayer. Judge Burgess then referred the Tribe's recusal motion to Chief District Judge Coughenour, who denied the request also holding that it was untimely. Judge Coughenour stated that Judge Burgess had already ruled on at least fifteen different motions in the case and trial was scheduled four and one half months away.

■ The Tribe appeals all three denials of its recusal motion. According to the Tribe, the fact that Judge Burgess is a TPU ratepayer requires recusal. We disagree because the Tribe's motion was untimely, and we hold that neither Judge Burgess nor Judge Coughenour abused their discretion in denying the Tribe's recusal motion. ·

■ A motion for recusal must be made with "reasonable promptness" after the movant learns of the ground for making the motion. *Preston v. United States,* 923 F.2d 731, 733 (9th Cir.1991); *see also E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1294–96 (9th Cir.1992) (holding that a motion for recusal made after entry of an adverse judgment, although the movant had discovered the grounds for recusal before entry of judgment, was untimely because the "unexplained delay suggests that the recusal statute is being misused for strategic purposes"). The Tribe knew they were litigating a case against TPU in a Tacoma federal court with a Tacoma area judge, and therefore they should have known when they filed their complaint that they might want to seek recusal of the Tacoma area judge assigned to the matter. In addition, the Tribe made its recusal request sixteen months after filing its complaint, and six months after learning of the ratepayer opinion. This was untimely. Judge Burgess had ruled on several motions including a ruling against the Tribe on whether to certify the class, and trial was less than four and one half months away.

### B.

### Order Dismissing the United States as a Defendant

■ We review de novo a district court's dismissal for lack of subject matter jurisdiction. *La Reunion Francaise SA v. Barnes,* 247 F.3d 1022, 1024 (9th Cir.2001). We review for clear error the district court's factual findings relevant to its determination of subject matter jurisdiction. *United States v. Peninsula Communications, Inc.,* 287 F.3d 832, 836 (9th Cir. 2002).

■ 16 U.S.C. § 803(c) (" § 803(c)") provides:

That the licensee shall maintain the project works in a condition of repair adequate for the purposes of navigation and for the efficient operation of said works in the development and transmission of power, shall make all necessary renewals and replacements, shall establish and maintain adequate depreciation reserves for such purposes, shall so maintain and operate said works as not to impair navigation, and shall conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property. *Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or*

*accessory thereto, constructed under the license and in no event shall the United States be liable therefor.*

(Emphasis added.) This language is patently clear: the United States cannot be held liable for damages caused by hydroelectric projects federally licensed under the FPA. Because we conclude that Tacoma had a valid federal license to build and operate the Project, the FPA bars the Tribe's claims against the United States relating to the Project.

The Tribe attempts to distinguish its tort claims against the United States from § 803(c), claiming that § 803(c) does not grant the United States "immunity from its failure to take action to properly license and condition projects and to take care of its Indian wards." This attempt is unconvincing. In *Pacific Power and Light Co. v. Bonneville Power Admin.*, 795 F.2d 810, 816 (9th Cir.1986), we stated:

> Congress has decided that jurisdiction under the Act should be a function of the agency whose actions are being challenged rather than a function of the cause of action which petitioner asserts.... Unless constitutional issues are raised, jurisdiction under the [Pacific Northwest Electric Power Planning and Conservation Act] does not turn on the legal theory underlying a suit. For jurisdiction purposes, therefore, it matters not whether the utilities' suit is grounded in contract, administrative law or some other legal theory. Instead, jurisdiction arises because the actions of a particular agency are being challenged and because of the nature of the agency action at issue. The proper inquiry focuses on the agency being attacked and whether the factual basis for the attack is an agency action authorized by the Act.

The Tribe made claims against the United States Department of Energy and FERC, the United States Department of Interior and Bureau of Indian Affairs, and the United States Department of Commerce. All these claims arise from the Tribe's objection to FERC's licensing of the Project. Therefore, the Tribe challenges the "construction, maintenance, or operation" of the Project and the United States is immune from that challenge. Thus, we affirm the district court's order dismissing the United States as a defendant.

### C.

### Orders Granting Summary Judgment in Favor of Tacoma and Dismissing the Tribe's § 803 Claim For Failure to State a Claim Upon Which Relief Can be Granted.

We review the district court's grant of summary judgment de novo. *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002). We must determine, after viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* After applying this standard, we conclude that the district court correctly refused to entertain the Tribe's claims, but inappropriately granted summary judgment on certain Treaty-based claims where the district court lacked subject matter jurisdiction.

#### 1. The District Court's June 4, 2001 Order

On June 4, 2001, the district court granted summary judgment in favor of Tacoma on certain Treaty-based claims asserted by the Tribe: (1) unlawful taking of water needed to effectuate the Tribe's Treaty fishing rights; (2) unlawful interference with the Tribe's Treaty rights to fish, hunt, and gather roots and berries; (3) unlawful taking of access easements to usual and accustomed fishing and shell-fishing

grounds and stations; (4) unlawful taking of the Tribe's land and airspace by constructing the Project; (5) unjust enrichment from constructing, operating, and maintaining the Project; (6) negligence in designing, constructing, operating, and maintaining the Project; (7) negligence by violating state and federal approvals of the Project; (8) waste by diverting more water than is needed for the Project; and (9) declaratory judgment that the City's construction, operation, and maintenance of the Project violates state and federal law. The district court granted summary judgment on these claims because it held that it lacked subject matter jurisdiction to entertain the claims under the FPA.

The Treaty created property rights on behalf of the Tribe, and the parties agree that the dimensions and contours of these rights have changed over the years in connection with changing relevant circumstances. Thus, the Tribe has an adaptive entitlement that is not the equivalent of an immutable property right. *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) ("New conditions came into existence, to which those [Treaty fishing] rights had to be accommodated. Only a limitation on them, however, was necessary and intended, not a taking away."); *see also Fishing Vessel*, 443 U.S. at 686–87, 99 S.Ct. 3055 (finding that the Indian tribe had a right to a "fair share" of the available fish, but that right may be modified by changing circumstances such as when the tribe dwindles to just a few members).

The federally-licensed Project is an example of changing circumstances that alter the contours of the Tribe's continuing property rights. In *Federal Power Comm'n v. Tuscarora Indian Nation*, the Supreme Court made clear that the Tribe's adaptive entitlement was necessarily informed by the FPA:

The Federal Power Act constitutes a complete and comprehensive plan for the development and improvement of navigation and for the development, transmission and utilization of electric power in any of the streams or other bodies of water over which Congress has jurisdiction under its commerce powers, and upon the public lands and reservations of the United States under its property powers. *It neither overlooks nor excludes Indians or lands owned or occupied by them.* Instead, as has been shown, the Act specifically defines and treats with lands occupied by Indians— tribal lands embraced within Indian reservations.

362 U.S. 99, 118, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960) (emphasis added) (internal quotation marks omitted).

The FPA provides a scheme governing challenges to FERC licensing decisions. Under 16 U.S.C. § 825l(b) ("§ 825l(b)"):

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located ... or in the United States Court of Appeals for the District of Columbia, by filing in such court ... a written petition.... Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part.

Any collateral attacks on FERC's licensing orders are also governed by § 825l(b). *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 335–341, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 910–12 (9th Cir.1989); *Skokomish Indian Tribe v. France*, No. 1183

(W.D.Wash. 1962), *aff'd*, 320 F.2d 205 (9th Cir.1963).

In *California Save Our Streams*, FERC issued a license to construct and operate a hydroelectric power facility in the Sierra National Forest. 887 F.2d at 909–10. After failing to get relief from an administrative review of FERC's decision, the plaintiffs filed a complaint in district court against the United States Forest Service under the National Environmental Policy Act ("NEPA") and American Indian Religious Freedom Act ("AIRFA"). *Id.* at 910–11. The plaintiffs argued that § 825l(b) was inapplicable because they filed a lawsuit against the Forest Service that arose under NEPA and AIRFA, and that they were not attacking the licensing decision made by FERC, but were alleging the failure of the Forest Service to follow necessary procedural steps in statutes outside the purview of the FPA. *Id.* at 911–12. We rejected the plaintiffs' argument, holding that the FPA governs review of all disputes concerning the licensing of hydroelectric projects, and that the plaintiffs' action was at its core an attempt to restrain the licensing procedures authorized by FERC. *Id.*

Likewise, *Taxpayers of Tacoma* involved a FERC license to the City of Tacoma to construct a power facility on the Cowlitz River, which FERC granted despite Washington State's contention that the project could not be built without its approval. 357 U.S. at 323–28, 78 S.Ct. 1209. In a separate proceeding, the State appealed FERC's licensing decision to this court, which we affirmed and the Supreme Court denied writ of certiorari. *Id.* at 327–28, 78 S.Ct. 1209. At the same time, the City of Tacoma filed a state court action seeking a declaratory judgment that its issue of revenue bonds in connection with the building of the project was valid. *Id.* at 329, 78 S.Ct. 1209. After extensive state court proceedings, the Washington Supreme Court held that the FERC license could not give the City of Tacoma power to condemn state land necessary for the project without specific state legislation.

The United States Supreme Court accepted certiorari and framed the question as whether FERC's license gave the City of Tacoma federal eminent domain power to take state land necessary for construction of the project without state legislation conferring such authority. *Id.* at 333, 78 S.Ct. 1209. Relying on § 825l(b), the Supreme Court held:

> This statute is written in simple words of plain meaning and leaves no room to doubt the congressional purpose and intent. It can hardly be doubted that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had.... So acting, Congress in [§ 825l(b)] prescribed the specific, complete and exclusive mode for judicial review of the Commission's orders.... It thereby necessarily precluded de novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review. Hence, upon judicial review of the Commission's order, all objections to the order, to the license it directs to be issued, and to the legal competence of the licensee to execute its terms, must be made in the Court of Appeals or not at all.
>
> . . .
>
> [E]ven if it might be thought that this issue was not raised in the Court of Appeals, it cannot be doubted that it could and should have been, for that was the court to which Congress had given "exclusive jurisdiction to affirm, modify, or set aside" the [FERC] Commission's

order. And the State many not reserve the point, for another round of piece-meal litigation

. . . . .

357 U.S. at 335–37, 339, 78 S.Ct. 1209 (internal citations omitted). More importantly, the Supreme Court noted that FERC rejected the same contentions made by the State and made a finding required by the FPA that the City of Tacoma submitted satisfactory evidence of compliance with all applicable state laws. *Id.* at 337, 78 S.Ct. 1209. Thus, the State's contentions were impermissible collateral attacks on FERC's licensing decision. *Id.* at 341, 78 S.Ct. 1209.

Moreover, in 1948, the Tribe filed a quiet title action to establish title to a strip of tidelands adjoining the Tribe's reservation on the Hood Canal. *France,* 320 F.2d at 206. In *France,* the Tribe asserted that the Treaty, and an 1874 Executive Order setting aside the Skokomish Indian Reservation, vested the Tribe with title to the tidelands. *Id.* The district court rejected the Tribe's claim, which was affirmed by this court. *Id.* at 207–213. In its Findings of Fact and Conclusions of Law, the district court found that FERC issued a license to the City in 1924, and that:

> [E]ver since said time said license has been in full force and effect and, at all time since the issuance of said license, the defendant City of Tacoma has operated said hydroelectric project pursuant to and in accordance with the terms of said [FERC] license and all laws, rules and regulations pertaining thereto
>
> . . . .

*France,* No. 1183, Findings of Fact and Conclusions of Law. The court accordingly made a conclusion of law that the Tribe's claim constituted "insofar as the defendant City of Tacoma is concerned, a collateral attack upon the order of [FERC] in issu-

ing a license to the City of Tacoma" for construction of the Project. *Id.*

Here, the Tribe does not explicitly seek to modify, rescind, or set aside FERC's licensing order. Rather, the Tribe artfully pleads its claims based on the Treaty, 42 U.S.C. § 1983, the Fifth and Fourteenth Amendments, and federal common law as a basis for the district court's jurisdiction. However, the Tribe's claims flow directly from FERC's licensing order. The FPA required FERC to make a specific finding that the Project "will not interfere or be inconsistent with the purpose for which any reservation affected thereby was created or acquired." Moreover, the Tribe raised its claims in context of the FERC relicensing proceeding and FERC attached certain conditions to its license to mitigate any harm to the Tribe. The Tribe is now asking us to find that Tacoma's operation of the Project pursuant to its federal license gives rise to a damages action, which in turn requires us to conclude that FERC erred when it found that the license would not interfere with the purpose for which the reservation was created. As in *Taxpayers of Tacoma,* the Tribe's claims were raised and addressed in the FERC licensing proceeding, and any dispute over FERC's decision belongs first before FERC and then the circuit courts, not the district courts. Thus, the Tribe's claims are impermissible collateral attacks on FERC's licensing order.

Finally, the Tribe mistakenly relies on our decision in *United States v. Pend Oreille Public Utility Distr. No. 1,* 28 F.3d 1544 (9th Cir.1994) for the proposition that it may bring this damage action. In *Pend Oreille,* we found that the license issued by FERC did not authorize the Utility to flood reservation land, nor did it specify the amount of damages the Utility would owe to the Indian Tribe if it did. *Id.* at 1547–48. Moreover, we found that the

condition in 16 U.S.C. § 797(e) requiring a finding that the license will not interfere or be inconsistent with the purpose for which such reservation was created or required was not met. *Id.* at 1548. In sum, there was no approval of the flooding done by the Utility. We recited that FERC cannot award damages, and noted that the Supreme Court has recognized a variety of federal common law causes of action to protect Indian lands from trespass, and authorized damages for the trespass action at issue. *Id.* at 1549–1551.

Here, on the other hand, the Tribe is asking us to award damages although the City constructed and operated the Project in accordance with its federal license. We find unconvincing the Tribe's argument that the City could not have constructed and operated the Project in accordance with its federal license because FERC only issued a minor-part license for flooding of 8.8 acres of federal land. FERC issued only a minor-part license in 1924 because of its erroneous interpretation of its jurisdiction at that time. In 1963, FERC correctly interpreted its jurisdiction to issue licenses covering entire projects and not just those parts occupying or using federal land. In light of this interpretation, FERC characterized the City's subsequent application for a major project license covering the Project as a relicensing proceeding. FERC also noted that "the Commission's initial failure to issue a license for the complete project was founded upon a mistaken view of the law and the facts." Accordingly, in 1998, FERC issued a subsequent license for the entire Project. In the administrative proceeding, FERC addressed within context of the FPA the same contentions raised by the Tribe that they raise in this case. The Tribe's claims are merely collateral attacks on FERC's licensing order, and are not similar to the extrinsic trespass claim in *Pend Oreille* where the Utility's activity under scrutiny

was not authorized by the FERC license. In fact, we have not found any court decisions that have awarded damages for actions taken pursuant to a federal license to construct and operate a hydroelectric project.

Relying on *Pend Oreille,* the dissent asserts that "in issuing the [minor-part] license, FERC never considered the Tribe's interests in the construction and operation of the Project as a whole, as opposed to its interests in the mere 'occupancy and use' of 8.8 acres of federal land situated far from the reservation." We believe this is a mistaken view of the record. The record in this case is clear: FERC comprehensively considered the Tribe's interests in the Project "as a whole" in connection with issuing the license.

First, the City's 1923 license application, which resulted in the 1924 minor-part license, describes the Project in its entirety as it was then contemplated, as it was subsequently built, and as it remains today.

> The CITY OF TACOMA, a municipality, organized and existing under and by virtue of the Laws of the State of Washington, and situated in the County of Pierce, State of Washington, hereby makes application to the FEDERAL POWER COMMISSION, for a license for a project described herein and show on general and detail maps, signed by the applicant on the *21st* day of *November,* 1923, which maps are filed herewith and made a part hereof, said license to authorize the construction, operation and maintenance of certain project works, the principal ones of which are designated as follows on said maps: The project consists of an addition to the present municipal lighting plant of the City of Tacoma, and generally known as

"Cushman Power Project, Hydro Electric Power, Unit No. 2, City of Tacoma." The application states that "The proposed scheme of development is to utilize substantially all of the waters of the North Fork of the Skokomish River to generate electric power by water power...." The application states also that "[n]o part of the Project is or will be located upon any lands of the United States and will not flood or otherwise affect any lands of the United States except [the 8.8 acres]." Clearly, unlike the situation in *Pend Oreille,* the Project was to occupy and to impact identified lands other than those owned by the government, including the Tribe's reservation.

Second, when considering the City's application, § 4(d) of the FWA, now codified at 16 U.S.C. § 797(e), obligated FERC under the FPA to ensure that its licenses did not "interfere with ... the purpose for which any reservation affected thereby was created or acquired." In the license at issue, FERC explicitly referred to the City's application for a "complete power Project" and specifically found that

> The project, as hereinafter described, will be best adapted to a comprehensive scheme of improvement and utilization for the purposes of water-power development and of other beneficial public uses, *and the license will not interfere or be inconsistent with the purpose for which any reservation affected thereby was created or acquired.*

(Emphasis added.)

The flooding of 8.8 acres of federal land was a sine qua non of the Project. By force of law, we believe that pursuant to § 4(d) FERC could not and would not have issued its license had it concluded that the Project "as a whole" would interfere or be inconsistent with the purposes for which the Tribe's reservation was created. Thus, we believe also that FERC did fully and fairly comply with § 4(d) and consider the Tribe's interests in the Project as a whole during the licensing process, notwithstanding the ultimate issuance of only a minor-part license. It is clear to us that had FERC not been laboring under a mistake of law as to the extent of its actual authority, it would have indeed issued the license for the entire Project, as it concluded in 1963 when it rectified its mistaken belief, and again in 1998 when it issued a license for the entire Project. Given that FERC's choice of the limited *form* of its license was a mistake, the form should not on this record triumph over substance.

The key to deciding this issue is not what the license says, but whether the Tribe's interests were fully and comprehensively considered. Here, they were. It is this salient fact that distinguishes this case from *Pend Oreille* upon which the dissent relies, a case where the licensing decision did not take into account whether the Project would affect a reservation six miles removed from the Project's boundary.

 Although we agree with the district court's result, summary judgment was not the appropriate vehicle to implement its conclusions. The district court's holding—affirmed here by us—that these claims are impermissible collateral attacks on FERC's licensing order means the district court lacked jurisdiction to hear the case under § 825l(b). Summary judgment is an inappropriate disposition when the district court lacks jurisdiction. *Yeutter,* 887 F.2d at 912–13. Consequently, we must vacate the judgment on these claims and remand with directions for the district court to dismiss these claims. *Id.* at 913.

### 2. The District Court's August 9, 2001 Order

The district court granted summary judgment in favor of Tacoma on the follow-

ing state law claims based on aggradation[5] harms because the applicable statute of limitations had passed: (1) inverse condemnation; (2) trespass; (3) tortious interference with property; (4) conversion; (5) negligence; (6) negligent misrepresentation; (7) private and public nuisance; and (8) violation of Wash. Rev.Code § 4.24.630 prohibiting persons from going onto the land of another and wrongfully causing waste or injury to the land, or wrongfully injuring personal property. The applicable state statutes of limitation for these claims are (1) ten years for inverse condemnation, *Highline Sch. Distr. v. Port of Seattle*, 87 Wash.2d 6, 548 P.2d 1085, 1089 (1976); and (2) three years for trespass, negligence, conversion, tortious interference, and nuisance, Wash. Rev.Code § 4.16.080.

■ On February 16, 1989, Russell Busch ("Busch"), the then attorney for the Skokomish Tribe, wrote a letter to Gary Hansen at the Washington Department of Ecology that stated:

> Please consider this letter both a formal protest and an intergovernmental comment by the Skokomish Indian Tribe with regard to the referenced water rights Applications for Permit and any other water use authorizations sought by the City of Tacoma in the Skokomish River Basin.
>
> . . .
>
> The Skokomish Tribe resides upon a federal Indian Reservation on the Skokomish River downstream from the Applicant's [City of Tacoma] diversions and impoundments. It is the position of the Tribe that Applicant's actions reduce the natural flow of the river in such a way that: (1) Indian treaty fisheries are seriously reduced both on the Reservation

and at other usual and accustomed places, in violation of the Treaty of Point No Point; (2) the federal reserved water rights of the Skokomish Reservation are unlawfully interfered with; and (3) the reduction of tributary inflow caused by Tacoma's impoundments and diversions is a direct and proximate cause of channel aggradation and flooding on [and] above the reservation.

We agree with the district court that the Tribe's aggradation-related claims accrued at least by February 16, 1989 when Busch wrote the above letter, and that summary judgment was therefore proper. The Tribe filed its complaint on November 19, 1999, more than ten years after its aggradation-related claims accrued. Thus, the aggradation-related claims are barred by the statute of limitations. We note also that the state causes of action dismissed as impermissible collateral attacks on FERC's licensing decision above—unjust enrichment, negligence, and waste—are also barred by the applicable statute of limitations.

### 3. 16 U.S.C. § 803(c)

■ The Tribe asserted also a federal claim under § 803(c), which requires licensees to maintain project works in a condition of repair adequate for the purpose of navigation and as not to impair navigation. Section 803(c) specifically exempts the United States from liability while stating that licensees will be liable for damage to the property of others occasioned by the construction, maintenance, or operation of the project works. In its August 9, 2001 order, the district court dismissed this claim for failure to state a claim upon which relief could be granted, holding that

---

**5.** Aggradation causes flooding and elevated water tables affecting property on the reservation.

§ 803(c) does not provide for a private cause of action. We review de novo a dismissal for failure to state a claim. *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1035 (9th Cir.2002).

▇▇ We agree with the district court, and, as it did, adopt the holding of *DiLaura v. Power Auth. of State of NY,* 982 F.2d 73, 77–79 (2d Cir.1992). In *DiLaura,* the Second Circuit held that § 803(c) did not create a private cause of action, but merely preserved existing state causes of action against licensees. *Id.* The Second Circuit noted that neither the statutory language nor legislative history of § 803(c) revealed any Congressional intent to create a private cause of action against FERC licensees. *Id.* Thus, we affirm the district court's dismissal of the Tribe's § 803(c) claim for failure to state a claim upon which relief could be granted.

### D.

### Order Denying Class Certification

Because we affirm the district court, except with respect to the Tribe's treaty-based claims against Tacoma where we remand with instructions to dismiss, we need not address the Tribe's appeal from the district court's denial of class certification. *See, e.g., Alexander v. Whitman,* 114 F.3d 1392, 1398 n. 7 (3rd Cir.1997) (noting that because the court held that dismissal of the complaint under Federal Rule of Civil Procedure 12(b)(6) was proper, the court did not need to address the propriety of the district court's denial of plaintiffs' motion for class certification); *Hennessy v. Fed. Deposit Ins. Corp.,* 58 F.3d 908, 924 (3rd Cir.1995) (noting that because the court held the relevant claims could not survive summary judgment, the court did not need to address the propriety of the

district court's decision to deny class certification).

### CONCLUSION

We affirm the district court's (1) denial of the Tribe's recusal motion, (2) summary judgment in favor of Tacoma on the Tribe's aggradation-based state law claims, and (3) dismissal of the Tribe's § 803(c) claim for failure to state a claim upon which relief could be granted. Finally, because the district court inappropriately granted summary judgment in favor of Tacoma on the Tribe's Treaty-based claims where the district court lacked jurisdiction to hear those claims, we vacate the judgment on those claims and remand with directions to the district court to dismiss those claims. Parties shall bear their own costs.

AFFIRMED, in part, VACATED and REMANDED with instructions to dismiss, in part.

TASHIMA, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the majority opinion, except for Part C.1 of the "Discussion" section. Part C.1 concludes that the City of Tacoma and Tacoma Public Utility (together, "Tacoma") constructed and operated the Cushman Project ("Project") in accordance with the "minor part" license issued in 1924, and that the Tribe's claims based on the construction and operation of the Project constitute a collateral attack on the license, even though the only purpose of the license was to grant Tacoma the right to clear 8.8 acres of federal land. I respectfully dissent from this conclusion because it is in conflict with our established case law. I would permit the Tribe to sue for damages for the alleged trespass caused by the construction and continued operation of the Project.

FERC[1] is obligated under the Federal Power Act ("FPA") to ensure that its permits do not "interfere with ... the purpose for which any reservation affected thereby was created or acquired." 16 U.S.C. § 797(e). Pursuant to this obligation, FERC concluded that the minor part license issued to Tacoma would not negatively affect the Skokomish Reservation. The 1924 license, however, did not "authorize the construction and operation of the Cushman Project, but rather merely authorized the inundation of U.S. lands that would *result from* the construction, operation, and maintenance" of the Project. *City of Tacoma,* 67 F.E.R.C. 61,152 (1994) (emphasis added). In other words, in issuing the license, FERC never considered the Tribe's interests in the construction and operation of the Project as a whole, as opposed to its interests in the mere "occupancy and use" of 8.8 acres of federal land situated far from the reservation. The 1924 license is very specific in its purpose and scope:

> *Article 1.* This license is issued for the purpose of authorizing the occupancy and use of a tract of land approximately 8.8 acres in area in the NE ¼ of NW ¼ of Section 10, T. 23 W., R. 5 W. W.M., said land constituting a minor part of said power project....

*See also* 67 F.E.R.C. 61,152 (concluding that the use of minor part licenses was a "finding of convenience based on an erroneous conclusion of law ... as constituting 'minor parts' of a complete project").

The majority reasons that because the Tribe represented its interests in the mandatory relicensing proceedings beginning in 1974, any claims premised on harm caused by the Project's construction and operation constitutes an impermissible collateral attack on the 1924 minor part license. These earlier proceedings, however, cannot immunize parties from damages for harms arising from an illegal minor part license. Indeed, the majority acknowledges that FERC "erroneous[ly] interpreted" the FPA when it granted Tacoma a permit to build the Project based on the minor part license, but it holds nonetheless that the eventual licensing of the Project over 70 years later somehow rectifies any damage caused by the Project in the interim.

The majority asserts that *City of Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) and *California Save Our Streams, Inc. v. Yeutter,* 887 F.2d 908 (9th Cir.1989), govern this case. But both cases are readily distinguished in that they prohibited parties from bringing collateral attacks against fully-conditioned licenses that covered every aspect of the parties' collateral suits. In *Save Our Streams,* we dismissed a district court action brought by an environmental group seeking declaratory and injunctive relief because the complaint attacked conditions "included in the FERC license." *Id.* at 912. We concluded that "even if [plaintiff] attempt[s] to style this as an independent claim against the Forest Service, the practical effect of the action in district court is an assault on an important ingredient of the FERC license." *Id.* Even by the most expansive understanding of artful pleading, the Tribe's damage claims based on the construction and operation of the Project cannot possibly be construed as an "ingredient" of a license that included only one provision concerning a small portion of federal land situated far upstream.

The majority's reliance on *Taxpayers of Tacoma* is similarly misplaced. The Court

---

1. For convenience, I refer to both the Federal Energy Regulatory Commission and its predecessor, the Federal Power Commission, as "FERC."

in that case recognized only that Congress "had given [FERC] exclusive jurisdiction to affirm, modify, or set aside" licenses. 359 U.S. at 339, 79 S.Ct. 847. The Tribe's trespass action that we consider here is not an attempt to modify or set aside the 1924 license. Rather, the Tribe attempts to recover damages caused by actions which were not authorized or made an "ingredient" of the license, namely, the construction and operation of the Project. Where a Tribe's interests have been fully considered and incorporated into a fully-conditioned license, the FPA operates to preclude the Tribe from bringing a collateral attack. *Save Our Streams*, 887 F.2d at 911–12. Congress intended the FPA's scheme comprehensively to cover all interested parties, including Indian tribes, so long as that party's interests had been fairly considered before licensing. *See Nat'l Wildlife Fed'n v. FERC*, 801 F.2d 1505, 1507–08 (9th Cir.1986) (reviewing history of congressional regulation of hydro power projects and concluding that the FPA "requires that a *comprehensive plan* for river basin development be available *before licensing*" (emphases added)). The FPA thus requires FERC fully to consider reservation land before the licensee can subsequently require an Indian tribe to submit to the FPA's remedial scheme. *See* 16 U.S.C. § 797(e); 16 U.S.C. § 803.[2] But where the alleged damages arise from an unconditioned project resulting from the "legal mistake" of never taking into account a tribe's interests, as is true in the case at bench, a challenge brought in district court to recover for harm arising from the project's operation is not a collateral attack. This is the holding of *United States v. Pend Oreille Public Utility District No. 1*, 28 F.3d 1544 (9th Cir.1994).

In *Pend Oreille*, we held that an Indian tribe was entitled to damages for trespass against a public utility for flooding tribal lands. We held in favor of the tribe because, "[b]ased on the language of [the license], the statutory scheme governing the use of Indian reservation lands, and the other evidence in the record, the project was to be operated in such a way as not to flood Reservation land." *Id.* at 1549. We reviewed the relevant provisions of the FPA, including Section 4(e)'s prohibition against the use of Reservation lands for power production unless the Commission finds that the license will not interfere with the purpose for which such Reservation was created or acquired.[3] *Id.* at 1548. In upholding the trespass action, we emphasized that:

> Neither the Commission nor the Secretary approved the flooding of the Reservation; the Commission did not find the Reservation could be flooded without interfering with the purpose for which the Reservation was created; the Secretary did not determine what conditions might be necessary for the protection and utilization of the Reservation; the Commission did not fix an annual charge for use of Reservation land, and the Tribe was not asked to approve such a charge.

*Id.* We explained that the omissions in the license "apparently resulted from the failure of the Utility to disclose that Reservation land would be flooded by the project," because the license itself indicated that the project would be constructed and main-

---

**2.** In relevant part, 16 U.S.C. § 803(a)(1) provides: "All licenses issued under this subchapter shall be on the following conditions: (a) That the project adopted ... shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan...."

The original version of the FPA used the phrase "comprehensive scheme" rather than "plan", to the same effect.

**3.** Section 4(e) of the FPA is now codified as 16 U.S.C. § 797(e).

tained in a way that the Reservation would not be affected. *Id.* The license provided that the water level would exceed normal flows "for possibly 24 miles upstream," but the reservation, which was situated 30 miles upstream, was flooded nonetheless. *Id.* Emphasizing that the terms of the license did not envision the flooding that occurred, we noted that the license incorporated a map identifying the project's boundary, and showing that the Reservation was located six miles outside that boundary. *Id.*

In this case, Tacoma's minor part license does not include any terms relating to the primary issue raised in the district court action, much less the design, construction, or maintenance of the Project itself. By failing to include any terms addressing the design, construction, or operation of the Cushman Project, the minor part 1924 license, just like the license in *Pend Oreille,* indicates by its silence that the "project would be so constructed and maintained that the Reservation would not be affected." *Id.* Thus, *Pend Oreille,* in all material respects, cannot be distinguished from this case. If anything, the minor part license here presents an *a fortiori* case because of its brevity, limited purpose, and, above all, its unlawfulness.

The majority reasons that the Tribe should be restricted to the FPA's remedial scheme because had FERC known that the 1924 license was unlawful, it would have granted a lawful license because it intended fully to consider the Tribe's interests in the whole Project. This assertion is pure speculation and is unsupported by the record. Because nothing in the license indicates that FERC undertook lawfully to consider the entire project, as mandated by the FPA, the Tribe is entitled to pursue its damage claims outside the confines of the FPA's remedial scheme, pursuant to *Pend Oreille.* The majority tries to avoid this outcome by referencing language in the minor part license as alleged proof that FERC in fact considered the Tribe's interests. But the language of the minor part license only supports the Tribe's claims. The relevant provision states that the license, *as hereinafter described,* will not "interfere or be inconsistent with the progress for which any reservation affected thereby was created or acquired." As noted above, the 1924 license is limited to authorizing the flooding of 8.8 acres of federal land, and nothing else. It thus cannot possibly encompass, contrary to the majority's holding, the Tribe's interests in the Project "as a whole." *Pend Oreille* requires that where a license plainly indicates that FERC failed to ensure that the Project would not interfere with Tribal purposes, the licensee cannot avoid potential liability by speculating that FERC never would have granted an inadequate license if it knew that it was insufficient.

The City and FERC knew as early as 1939 that the Cushman license was "arbitrary, capricious, without statutory or other authority, and contrary to law," yet neither Tacoma nor the Commission acted to remedy the situation by applying for or issuing a "proper major project license for [the Cushman Project] in accordance with the provisions of the Federal Power Act." *Pac. Gas & Elec. Co.,* 2 F.P.C. 632, 1939 WL 1446 (1939) (informing Pacific Gas, as transferee, that the minor part license was unlawful). In 1994, FERC acknowledged once again that the 1924 license did not "authorize the construction, operation, and maintenance of the Cushman Project, but rather merely authorized the inundation of U.S. lands that would result from the construction, operation, and maintenance" of the Project. *City of Tacoma,* 67 F.E.R.C. 61,152. Although FERC has admitted the inability of its minor part licenses to serve as proxies for major water projects, the majority today is unwilling to accept this

admission, and holds that "the City constructed and operated the Project in accordance with its federal license." Maj. op. at 7159.

*Pend Oreille* permits recovery in district court where a license issued by FERC fails to contemplate flooding that occurs outside the scope of the license. Here, the 1924 minor part license "merely authorized the inundation of [8.8 acres of] U.S. lands that would result from the construction, operation, and maintenance" of the Cushman Project. The Tribe's lands are not within or even near this territory, nor does the Tribe seek damages caused by the clearing and eventual flooding of this relatively small area of land. Instead, it seeks damages caused by the construction and operation of the Cushman Dam and Power Plant. These claims are outside the scope of the minor part license. Because Tacoma failed fully to avail itself of the FPA's comprehensive scheme by obtaining a major, fully-conditioned license, and knowingly operated the Project for 70 years under an unconditioned minor part license, I disagree that it should now be allowed to seek refuge under the FPA's comprehensive remedial scheme to preempt the Tribe from seeking damages caused by the Project. I do not believe Congress intended Tacoma to have it both ways. Because this is not a collateral attack on the 1924 minor part license, this case is not governed by 16 U.S.C. § 825*l*(b).[4] I respectfully dissent from Part C.1.

---

4. Ignoring *Pend Oreille,* the majority states in a *non sequitur* that "we have not found any court decisions that have awarded damages for actions taken pursuant to a federal license to construct and operate a hydroelectric project." Maj. op. at 561. The point the majority repeatedly ignores is that the Cushman Project was *not* built "pursuant to a federal license to construct and operate a hydroelectric project."